Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

[additional counsel on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM VIGNOLA, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>FAT BRANDS, INC., ANDREW A. WIEDERHORN, RON ROE, JAMES NEUHAUSER, EDWARD H. RENSI, MARC L. HOLTZMAN, SQUIRE JUNGER, SILVIA KESSEL, JEFF LOTMAN, FOG CUTTER CAPITAL GROUP INC., and TRIPOINT GLOBAL EQUITIES, LLC,<br><br>    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

1    Plaintiff Adam Vignola ("Plaintiff") individually and on behalf of all other
2  persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's
3  complaint against Defendants (defined below), alleges the following based upon
4  personal knowledge as to Plaintiff and Plaintiff's own acts, and information and
5  belief as to all other matters, based upon, *inter alia*, the investigation conducted by
6  and through Plaintiff's attorneys, which included, among other things, a review of the
7  Defendants' public documents, conference calls and announcements made by
8  defendants, United States Securities and Exchange Commission ("SEC") filings, wire
9  and press releases published by and regarding FAT Brands, Inc. ("FAT Brands" or
10 the "Company"), and information readily obtainable on the Internet. Plaintiff believes
11 that substantial evidentiary support will exist for the allegations set forth herein after
12 a reasonable opportunity for discovery.

13              **<u>NATURE OF THE ACTION</u>**

14    1.    This is a securities class action on behalf of all those who purchased
15 FAT Brands common stock pursuant to FAT Brands' October 23, 2017 initial public
16 stock offering (the "IPO"), seeking to pursue remedies under the Securities Act of
17 1933 (the "Securities Act"). As alleged herein, the Defendants are responsible for
18 false and misleading statements and omitting material facts in connection with Fat
19 Brands' IPO. Specifically, Defendants authorized or signed the Qualified Statement
20 and an Offering Circular (collectively, the "Offering Documents") and/or participated
21 in making false and misleading statements that omitted material facts in connection
22 with the IPO roadshow. The IPO was made under Regulation A of the Securities Act,
23 and the Offering Circular was filed purportedly pursuant to Rule 253(g)(2). This
24 lawsuit asserts claims under §12(a)(2) of the Securities Act, which provides buyers of
25 securities an express remedy for material misstatements or omissions made by any
26 seller or solicitor in connection with the offer or sale of the issuer's securities
27 involving a prospectus or oral communications, and §15 of the Securities Act, which

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

extends liability for the §12(a)(2) claims to those who controlled the issuer, here FAT Brands.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§12(a)(2) and 15 of the Securities Act (15 U.S.C. §§77l(a)(2) and 77o).

3.     This Court has jurisdiction over this action pursuant to §22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331.

4.     Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) as the Company's headquarters is located in this Judicial District.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff purchased FAT Brands common stock pursuant and/or traceable to the IPO and was damaged thereby.

7.     Defendant FAT Brands is a multi-brand franchising company that acquires, markets, and develops fast casual and casual dining restaurant concepts in including Fatburger, Buffalo's Café, Buffalo's Express, Ponderosa Steakhouse, and Bonanza Steakhouse. FAT Brands is a Delaware corporation with headquarters at 9720 Wilshire Blvd., Suite 500, Beverly Hills, CA 90212. The Company's shares trade on NASDAQ under the ticker "FAT."

8.     Defendant Andrew W. Wiederhorn ("Wiederhorn") has been FAT Brands' President, Chief Executive Officer ("CEO"), and a member of the Board of Directors (the "Board") at all relevant times, including at the time of the Company's IPO. Defendant Wiederhorn is also the chairman, CEO and controlling shareholder of

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

defendant FCCG (defined below), which owned 100% of FAT Brands' common stock prior to the Company's IPO. As one of FAT Brands' executives in the IPO working group, Wiederhorn reviewed and approved, and participated in making, statements to investors, including statements in the Offering Documents and roadshow. Upon information and belief, Defendant Wiederhorn is a resident of California.

9.    Defendant Ron Roe ("Roe") has been the Company's Chief Financial Officer ("CFO") at all relevant times, including at the time of the Company's IPO. Defendant Roe is also the CFO of FCCG. Upon information and belief, Defendant Roe is a resident of California.

10.   Defendants Wiederhorn and Roe are executives of FAT Brands who participated in the Company's IPO roadshow and are sometimes referred to herein as the "Executive Defendants."

11.    Defendant James Neuhauser ("Neuhauser") is, and was at the time of the IPO, a member of FAT Brands' Board. As a member of the Board, Defendant Neuhauser reviewed and approved, and participated in making, statements to investors in the Offering Documents. Upon information and belief, Defendant Neuhauser is a resident of Virginia.

12.   Defendant Edward H. Rensi ("Rensi") is, and was at the time of the IPO, the Chairman of FAT Brands' Board. As a member of the Board, Defendant Rensi reviewed and approved, and participated in making, statements to investors in the Offering Documents. Upon information and belief, Defendant Rensi is a resident of Illinois.

13.   Defendants Marc L. Holtzman ("Holtzman"), Squire Junger ("Junger"), Silvia Kessel ("Kessel") and Jeff Lotman ("Lotman") were listed as "Director Nominees" in the Offering Documents, and would become members of FAT Brands Board at the time of the IPO.  These defendants were financially motivated to complete FAT Brands' IPO as they were each in line to receive stock options for

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  15,000 shares of FAT Brands common stock in connection with the IPO. Upon

2  information and belief, Holzman is a resident of Colorado, Junger is a resident of

3  California, Kessel is a resident of New Jersey, and Lotman is a resident of California.

4        14.   The defendants referenced above in ¶¶ 8, 9 and 11–13 signed or

5  authorized the signing of the Offering Documents used to conduct the IPO, or were

6  listed therein as "Director Nominees," and are sometimes referred to herein as

7  "Individual Defendants."

8        15.   Defendant Fog Cutter Capital Group Inc. ("FCCG") was an Oregon-

9  based company that, at the time of the IPO, owned 100% of FAT Brands' common

10  stock and voting power. Following the IPO, FCCG retained 80% of FAT Brands'

11  common stock and voting power. Defendant Wiederhorn founded FCCG and was the

12  chairman of its board of directors at the time of FAT Brands' IPO. Collectively,

13  Defendant Wiederhorn and his family owned 75% of FCCG shares. FCCG once had

14  a public stock listing but lost that listing and now trades on the pink sheets.

15        16.   Defendant TriPoint Global Equities, LLC ("TriPoint") is an investment

16  banking firm that, along with its crowd-funding subsidiary Banq, acted as the

17  underwriter of the IPO, serving as both Lead Manager and Book Runner. TriPoint

18  participated in drafting and disseminating the Offering Documents used to conduct

19  the IPO, and participated in crafting and making statements in connection with the

20  Offering Documents, roadshow video, and other materials appearing on TriPoint's

21  and Banq's websites. TriPoint and its representatives assisted FAT Brands and the

22  Individual Defendants in planning the IPO and purportedly conducted an adequate

23  and reasonable investigation into the business and operations of FAT Brands, an

24  undertaking known as a "due diligence" investigation. The due diligence

25  investigation was required of the Underwriter Defendant in order to engage in the

26  IPO. During the course of "due diligence" the Underwriter Defendant had continual

27  access to confidential corporate information concerning FAT Brands' operations and

28  financial prospects. As a result of constant contacts and communications between

1   TriPoint representatives and FAT Brands, TriPoint knew, or should have known, of

2   FAT Brands' existing problems as detailed herein.   TriPoint is referred to herein

3   sometimes as the "Underwriter Defendant."  The Underwriter Defendant caused the

4   Offering Documents to be filed with the SEC and declared qualified in connection

5   with offers and sales thereof, including to plaintiff and the Class (as defined below).

6                          **<u>SUBSTANTIVE ALLEGATIONS</u>**

7                    **FAT Brands' Fast-Casual Restaurant Concepts**

8        17.    At the time of the IPO, FAT Brands was the franchiser of two fast casual

9   restaurant brands: Fatburger and Buffalo's Cafe/Buffalo's Express. According to the

10  IPO Offering Documents, FAT Brands "intend[ed] to complete the acquisitions [of]

11  Ponderosa and Bonanza [steakhouses], including one company-owned restaurant,

12  concurrently with the consummation of" the IPO, which would bring FAT Brands'

13  fast-casual brand concepts up to three.

14       18.    As a franchisor, FAT Brands generally did not own or operate actual

15  restaurant locations. Instead, FAT Brands historically generated relatively strong

16  margins (as compared to other restaurant companies) by charging franchisees an

17  initial franchise fee and ongoing royalty payments. According to the IPO Offering

18  Documents, FAT Brands' "asset light franchisor model provide[d] the opportunity for

19  strong profit margins and an attractive free cash flow profile while minimizing

20  restaurant operating company risk, such as long-term real estate commitments or

21  capital investments." At the time of its IPO, FAT Brands' existing portfolio of

22  restaurant brands had a presence in seven states and 18 countries, totaling 176

23  locations.

24       19.    Prior to the IPO, FAT Brands' flagship operating subsidiary, Fatburger

25  North America, Inc. ("Fatburger"), accounted for the overwhelming majority of the

26  Company's locations, revenues and profits, with 157 Fatburger locations across five

27  states and 18 countries.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

20.    FAT Brands' other operating subsidiary, Buffalo's Franchise Concepts Inc. ("Buffalo Cafe"), accounted for another 19 locations.  Additionally, Buffalo's Express, which is a smaller, fast-casual variant of Buffalo's Cafe, has been cobranded by FAT Brands with Fatburger, such that at the time of the IPO there were an additional 68 co-branded Buffalo's Express/Fatburger locations globally.

21.    Regarding FAT Brands' post-IPO acquisition of Homestyle Dining LLC, which then owned Ponderosa Franchising Company and Bonanza Restaurant Company ("Ponderosa & Bonanza"), the Offering Documents stated that those brands would "offer the quintessential American steakhouse experience, for which there is strong and growing demand in international markets, particularly in Asia, the Middle East, Europe and Central America." Ponderosa & Bonanza were established in 1965 and 1963, respectively. As of June 25, 2017, there were 100 Ponderosa and 20 Bonanza steakhouse restaurants operating under franchise and sub-franchise agreements in 19 states in the United States, Canada, Puerto Rico, the United Arab Emirates, Egypt, Qatar, Taiwan, and one company-owned Ponderosa restaurant in the United States.

**FCCG's Development of FAT Brands**

22.    On August 15, 2003, Beverly Hills-based FCCG completed a $7 million investment and financing package for Fatburger, and would later acquire the remainder of the Company in 2011. Defendant Wiederhorn, who founded FCCG, became Fatburger's CEO in 2006 (and continued to serve as FCCG's Chairman and CEO, as well as Fatburger's CEO and President, through the time of FAT Brands' IPO).

23.    After Defendant Wiederhorn's appointment as CEO of Fatburger in 2006, Fatburger was barred from selling additional franchises in California for several months due to Wiederhorn's prior felony convictions. He plead guilty to two felony charges in 2004 for filing a false tax return and paying an illegal bribe to Capital Consultants.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

24.     Then, after borrowing approximately $3.85 million from financier General Electric Capital Business Asset Funding Corp. ("GE"), on or about March 31, 2009, several Fatburger subsidiaries received notices of default and demand for payment from GE by April 9, 2009.  Because Fatburger was unable to repay GE, several Fatburger subsidiaries filed for Chapter 11 bankruptcy protection on April 7, 2009 - including Fatburger Restaurants of California and Fatburger Restaurants of Nevada - which were later jointly administered in a single bankruptcy proceeding.

25.     After the bankruptcy filing, NASDAQ delisted FCCG's common stock for failing to timely file financial reports with the SEC. The approximately eight million shares of FCCG common stock then issued and outstanding as of March 10, 2010 became worthless.

26.     In 2011, FCCG acquired the 25-unit Buffalo's Cafe franchise brand concept and subsequently converted both the Fatburger and Buffalo's Cafe brands into a franchisor model. After the acquisition of Buffalo's Cafe, FCCG developed the Buffalo Express concept and rolled out scores of cobranded Fatburger/Buffalo Express restaurants.

27.     In March 2017, FCCG agreed to acquire Homestyle Dining LLC, the franchisor of the Ponderosa & Bonanza restaurants, with the specific plan to use the forthcoming proceeds from the FAT Brands IPO to fund that acquisition.

**FCCG's Control of FAT Brands Before and After the IPO**

28.     Before the IPO, FCCG owned all eight million shares of FAT Brands common stock and controlled 100% of its voting power. FAT Brands was formed as a Delaware corporation on March 21, 2017 for the purposes of completing a public offering and acquiring and continuing the businesses being conducted by subsidiaries of FCCG. At the time of the IPO, Defendant Wiederhorn was serving as President and CEO of FAT Brands as well as the Chairman and CEO of FCCG. FAT Brands' CFO and Chief Controlling Officers are also affiliates and executives of FCCG. The Wiederhorn family collectively owned 75% of FCCG at the time of the IPO.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

29.     FCCG, through Defendants Wiederhorn, Roe and other FCCG affiliates, planned to conduct FAT Brands' IPO as a Regulation A+, or "Reg A+," offering. Under Title IV of the 2015 Jumpstart Our Business Startups (JOBS) Act, a private company can raise money and go public vis-à-vis a Reg A+ offering pursuant to a streamlined, expedited review process in which the company would be required to make its offering memorandum public just 21 days before SEC qualification.

30.     The Defendants planned that FAT Brands would sell two million shares of the Company's common stock through a Reg A+ offering to investors for $12 per share, raising $24 million in gross proceeds and leaving FCCG's ownership of its eight million shares intact (now worth 80% of the total voting power of FAT Brands). FAT Brands simultaneously planned to use $10.55 million to purchase Ponderosa & Bonanza, and to send $9.5 million of its IPO proceeds to FCCG to repay debt. After the repayment of the $9.5 million to FCCG, FAT Brands would assume a $20.5 million debt obligation to FCCG, which would carry a 10% interest rate and mature five years following the IPO.

31.     According to the Offering Documents, FAT Brands intended to pay annual dividends of $0.48 per share, and with the IPO priced at $12 per share, that equated to a 4% yield on the stock being sold in the IPO. Notably, Defendant FCCG, as the Company's controlling shareholder, would receive the lion's share of those stock dividends.

### The Materially False and Misleading Offering Documents and Roadshow Documents

32.     On or about September 6, 2017, FAT Brands filed with the SEC its first draft of Form 1-A (File No. 024-10737). Following several amendments made in response to comments received from the SEC, the Form 1-A was qualified by the SEC on October 3, 2017. On October 18, 2017, a final amendment was made on Form 1-A POS and utilized for the IPO (the "Qualified Statement"). The Qualified Statement was signed by Defendants Wiederhorn, Roe, Neuhauser, and Rensi.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

33.    On October 5, 2017, FAT Brands filed an Offering Circular with the SEC, which was subsequently amended and filed with the SEC on October 23, 2017. The Qualified Statement and Offering Circular are collectively referred herein as the "Offering Documents."

34.    Beginning on or around August 3, 2017 (at the latest), utilizing the Offering Documents, Defendant FAT Brands, the Executive Defendants and the Underwriter Defendant commenced a multi-city roadshow to market FAT Brands common stock to the investing public. The roadshow was completed on or about October 20, 2017, and the IPO was priced at $12 per share. Due to their rigorous marketing efforts, defendants raised $24 million through the sale of two million shares of FAT Brands common stock during the IPO roadshow - leaving defendant FCCG with 80% of FAT Brands' outstanding common stock and the $3.84 million in annual dividends that would be paid on those shares.

35.    Mark Elenowitz ("Elenowitz"), CEO of Defendant TriPoint, told *Forbes* on October 23, 2017 that "[t]he offering was very well received with $64 million-of interest – we had to decline $40 million. We built the broker-dealer syndicate of 21 members and we had to decline an additional 6 syndicate members that wanted to join, but by then we were already oversubscribed." According to *Forbes*, "[t]his level of over-subscription is a first for Reg A+," "mak[ing] the FAT Brands offering by far the most successful Reg A+ to date for institutional engagement."

36.    As part of the IPO roadshow, on or about September 19, 2017, defendants conducted a live interactive online webinar, featured on VirtualInvestorConference.com, to promote FAT Brands' forthcoming offering. Defendant Wiederhorn and Elenowitz (CEO of Underwriter Defendant TriPoint) hosted the webinar and answered questions from potential investors about FAT Brands and the offering. The webinar included a video presentation that contained material misstatements and omissions that defendants participated in making.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

37.    For example, during the webinar, Defendant Wiederhorn discussed Defendant FCCG's holdings in FAT Brands, and how FCCG would continue to hold at least 80% of FAT Brands after the IPO. To highlight this point, Wiederhorn showed the following slide during the video presentation, explaining that FCCG would hold 80% of FAT Brands' common stock and outside investors would hold 20% of the Company's common stock:



38.    The images and statements communicated to investors that are referenced in the preceding paragraph contained material misstatements and omissions.  Indeed, what was not disclosed during the webinar was that the combined Wiederhorn family's ownership of FCCG was actually 75% - meaning the Wiederhorn family, not just FCCG, would be FAT Brands' controlling shareholder owners following the IPO. Moreover, there was no disclosure that Defendant Wiederhorn planned to merge FCCG into FAT Brands in 2018 or 2019, effectively

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  allowing him and his family to take FCCG public without undertaking a formal IPO
2  process.

3     39.    Also during the webinar, Defendant Wiederhorn touted FAT Brands'
4  "asset-light business model" and explained that FAT Brands, as a franchisor, was not
5  making significant capital expenditures, and was thus maintaining an attractive free
6  cash flow profile. Defendant Wiederhorn presented the following slide regarding
7  FAT Brands' asset-light model:



21     40.    However, the images and statements communicated to investors that are
22  referenced in the preceding paragraph also contained material misstatements and
23  omissions.  For example, there was no mention of the fact that FAT Brands' then-
24  present free cash flow was not enough to cover its outsized dividend, which at $0.48
25  per share annually, would cost FAT Brands $5 million to service (which was
26  particularly critical because FAT Brands was assuming the $20.5 million debt to
27  FCCG as part of the IPO, thus increasing its leverage and debt servicing costs).

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

41.   Toward the end of the webinar, Defendant Wiederhorn and Elenowitz (on behalf of Underwriter Defendant TriPoint) fielded real-time questions from investors participating in the webinar. In response to the question "what is [FAT Brands'] EBITDA margin," Wiederhorn replied "almost 60%," adding that the EBITDA margin is "very, very strong." However, the reality was that both the Fatburger and Ponderosa & Bonanza brands were on track to report lower revenues in 2017 than they did in 2016, which meant that the combined company's profit margins were on the decline at the time of the IPO. The lower margins, coupled with the increased new leverage, put FAT Brands on course to report lower 2017 profits. This rendered the statements touting FAT Brands' "EBITDA margins" materially false and misleading, as sales growth for the existing brands' stores had already plummeted and the Ponderosa & Bonanza acquisition would further diminish sales growth and profits.

42.   Moreover, the Offering Documents for the IPO were negligently prepared and, as a result, contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

43.   Despite having reported achieving $1.7 million in net income on $4.3 million of revenue during the first six months of 2017 – a 40% net margin and an astounding 62% operating margin, which margins were used to price the shares sold in the IPO based on their future assumed profitability – with both the Fatburger and Ponderosa & Bonanza brands on track to report lower revenues in 2017 than they did in 2016 the combined company's profit margins were on the decline at the time of the IPO.  This, when coupled with the increased new leverage, put the Company on course to report lower 2017 profit and rendered statements in the Offering Documents such as "between 2012 and 2016, unadjusted for the acquisition of Ponderosa and Bonanza, the company achieved compound annual growth rates in net revenue, net income, and EBITDA of 9.9%, 40.0% and 35.3%, respectively, reflecting consistent

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  yearly growth over this period," materially false and misleading because sales growth
2  for the existing brands' stores had already plummeted, and the Ponderosa & Bonanza
3  acquisition would further diminish sales growth and profits.

4      44.    By October 2017, after having agreed to pay $10.55 million to acquire
5  Ponderosa & Bonanza in March 2017, FAT Brands had received internal reports and
6  data indicating that its revenues were not growing anywhere near as robustly as
7  projected by FCCG when negotiating the acquisition.

8      45.    Although the Offering Documents repeatedly referenced how FAT
9  Brands' "Capital Light Business Model [Drove] High Free Cash Flow Conversion"
10 by "requiring minimal capital expenditures," the Offering Documents failed to
11 disclose that FAT Brands' then-present free cash flow was not enough to cover its
12 outsized dividend, which, at $0.48 per share annually, would cost the Company $5
13 million to service (which was particularly critical because FAT Brands was assuming
14 the $20.5 million debt to FCCG as part of the IPO, thus increasing its leverage and
15 thus debt servicing costs).

16     46.    Furthermore, while the Offering Documents represented that the
17 "existing markets for Fatburger, Buffalo's Cafe, Buffalo's Express, and Ponderosa
18 and Bonanza locations are far from saturated and can support a significant increase in
19 units," the reality at the time of the IPO was that the "fast-casual" dining sector was
20 extremely saturated, and the sector was facing significant headwinds and a slowdown
21 in growth. For example, by 2017, fast-casual sales growth in the United States had
22 slowed to around 6%, as compared to 8% growth in 2016, and between 10%-11%
23 growth in each of the prior five years. Additionally, a number of notable fast-casual
24 dining concepts had posted significant losses at the time of the IPO, leading some
25 businesses to close locations (including Qdoba, Pie Five, Noodles & Co., and Pollo
26 Tropical) and others to file for bankruptcy (Cosi, Rita Restaurant Corp., and Garden
27 Fresh Corp.). For reference, one of the principal reasons for this slowdown in growth
28 was that customers were much more reluctant to spend their money on trendy fast-

- 13 -
CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

casual restaurant concepts, and instead preferred cheaper and quicker dining options, including traditional fast-food chains.

47.    Additionally, although the Offering Documents disclosed that "[i]n October 2015, [defendant] Rensi filed for protection under Chapter 11 of the Federal Bankruptcy Code," and that "in November 1998, [the former employer of Defendant Wiederhorn and his father-in-law, now FAT Brands' COO] underwent a pre-packaged bankruptcy," the Offering Documents failed to adequately disclose the bankruptcies filed by several of the Fatburger subsidiaries in 2009, or the financial problems that caused such bankruptcies, or the resulting financial impact that those bankruptcies had on FCCG.  Further, it was material information to investors that FAT Brands' management team was previously unable to obtain financing in connection with a prior acquisition spree.[1]

48.    Although the Offering Documents stated that Defendant "Wiederhorn beneficially own[ed] 38.2% of FCCG, and disclaim[ed] beneficial ownership of the Company held by FCCG except to the extent of his pecuniary interest in FCCG," the Offering Documents omitted the fact that the combined Wiederhorn family's ownership of FCCG was actually 75% - meaning the Wiederhorn family, not just FCCG, would be FAT Brands' controlling shareholder owners following the IPO.

49.    The Offering Documents further represented, among other things, that FCCG would "remain a significant stockholder" in FAT Brands following the

---

[1] Indeed, the IPO Offering Documents expressly stated that "[i]n addition to our pending acquisition of Ponderosa and Bonanza, as of the date of this Offering Circular we have entered into a letter of intent to acquire an additional restaurant concept with approximately 60 franchised stores for approximately $11,000,000, and are in discussions to acquire another restaurant concept with approximately 50 stores for a purchase price in the range of $26-30 million. We intend to finance future acquisitions through a combination of borrowings under a proposed new credit facility and by issuing new equity securities, including preferred stock if available on terms satisfactory to us."

- 14 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   Company's IPO, and that for so long as FCCG continued to own at least 80% of FAT

2   Brands the two companies would file joint tax returns, with FCCG receiving any tax

3   savings on the part of FAT Brands resulting from the combined filings (including as a

4   result of FCCG's net operation losses ("NOLs")).

5       50.   In reality, however, Defendant Wiederhorn was intending to merge

6   FCCG into FAT Brands in 2018 or 2019, effectively allowing him and his family to

7   take FCCG public without undertaking a formal IPO process, and unreasonably

8   benefitting FCCG financially.

9       51.   For example, Defendant FCCG and the Wiederhorn family alone knew

10  at the time of the IPO the amount of NOLs that FCCG then maintained – and they

11  alone then knew how the impending 2018 tax bill, which had been unveiled in

12  September 2017, would devalue those NOLs, reducing the value of the NOLs, and

13  FCCG's and the Wiederhorn family's incentive to keep FCCG and FAT Brands

14  separate.

15      52.   The statements referenced above in ¶¶ 36, 37, 39, 41, 43 and 45 – 49

16  were each materially false and misleading because they failed to disclose and

17  misrepresented the following adverse facts that existed at the time of the IPO:

18          a.   FAT Brands' sales growth had significantly declined;

19          b.   Sales growth at Ponderosa & Bonanza was significantly below

20  that which FAT Brands had believed it was when it agreed to acquire those brands in

21  March 2017;

22          c.   The fast-casual dining sector was extremely saturated and facing

23  significant headwinds and a slowdown in growth, which was largely caused by

24  customers fleeing to lower cost, quicker options such as traditional fast-food chain;

25          d.    FAT Brands' free cash flow was less than its $5 million annual

26  dividend obligations;

27          e.   The Wiederhorn family planned to merge FCCG into FAT Brands

28  following the IPO; and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1         f.    FCCG and the Wiederhorn family that owned it had already once

2   run FCCG/Fatburger into bankruptcy, resulting in its stock being delisted in

3   connection with the attempt to undertake an acquisition spree much like the spree

4   they were undertaking at FAT Brands at the time of the Company's IPO.

5        53.    Pursuant to Item 7(a)(2) of the Form 1-A Instructions, issuers must

6   "describe those distinctive or special characteristics of the issuer's operation or

7   industry that are reasonably likely to have a material impact upon the issuer's future

8   financial performance." Pursuant to Item 9(d) of the Form 1-A Instructions, issuers

9   are also required to "identify the most significant recent trends in production, sales

10   and inventory, the state of the order book and costs and selling prices since the latest

11   financial year." They "also must discuss, for at least the current financial year, any

12   known trends, uncertainties, demands, commitments or events that are reasonably

13   likely to have a material effect on the issuer's net sales or revenues, income from

14   continuing operations, profitability, liquidity or capital resources, or that would cause

15   reported financial information not necessarily to be indicative of future operating

16   results or financial, condition." At the time of the IPO, unbeknownst to investors,

17   FAT Brands' organic sales growth was declining and the sales growth at Ponderosa

18   & Bonanza was much lower than FCCG had presumed when it negotiated to pay

19   $10.55 million for the franchising rights in March 2017. The adverse events and

20   uncertainties associated with these negative trends were reasonably likely to have a

21   material impact on FAT Brands' profitability and, therefore, were required to be

22   disclosed in the Offering Documents, but were not.

23        54.    The IPO was successful for FAT Brands and the Underwriters

24   Defendant who sold two million shares of FAT Brands common stock to the

25   investing public at $12 per share, raising $24 million in gross proceeds ($22.2 million

26   net of underwriting fees and IPO costs).

27        55.    The price of FAT Brands common stock later plummeted as the market

28   learned the truth about FAT Brands' business metrics and financial prospects that

existed at the time of the Company's IPO. FAT Brands' common stock currently trades at approximately $7.80 per share or down over 35% from the Company's $12 IPO price less than one year earlier.

## **CLASS ACTION ALLEGATIONS**

56.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired the publicly traded securities of FAT Brands pursuant and/or traceable to the Company's IPO and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable. Since the IPO, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

58.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

a.     whether Defendants issued materially false and misleading statements;

b.     whether the Registration Statement was negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein;

c.     whether other statements issued by Defendants were materially misleading and/or omitted material information;

d.     whether Defendants acted with reckless disregard for the truth with respect other statements;

e.     whether the Company's securities traded on an efficient market; and

f.     the extent to which members of the Class have sustained damages and the proper measure of damages

61.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

62.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.     Defendants made public misrepresentations or failed to disclose material facts;

b.     the omissions and misrepresentations were material;

c.     the Company's securities met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

d.      the Company's shares were liquid and traded with moderate to heavy volume;

e.      as a public issuer, the Company filed periodic public reports with the SEC and NASDAQ;

f.      The Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

g.      The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available;

h.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

i.      Plaintiff and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

63.     Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

64.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972) as Defendants omitted material information in the Company's Registration Statement and Prospectus in violation of a duty to disclose such information as detailed above.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**COUNT I**
**Violations of §12(a)(2) of the Securities Act**
**Against Defendants FAT Brands, FCCG, the Executive Defendants, and the**
**Underwriter Defendants**

65.     Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

66.     By means of the defective Offering Documents and other statements made in connection with the roadshow, Defendant FAT Brands, Defendant FCCG, the Executive Defendants and the Underwriter Defendant promoted and sold FAT Brands' common stock to plaintiff and other members of the Class.

67.     The Offering Documents and roadshow contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above. These Defendants owed plaintiff and the other members of the Class who purchased FAT Brands common stock pursuant to the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents as set forth above.

68.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Offering Documents and roadshow presentation at the time Plaintiff acquired FAT Brands common stock.

69.     By reason of the conduct alleged herein, each of the Defendants named in this Count violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased FAT Brands common stock pursuant to the Offering Documents sustained substantial damages in connection with their purchases of FAT Brands stock. Accordingly,

- 20 -

1  plaintiff and the other members of the Class who hold the common stock issued

2  pursuant to the Offering Documents have the right to rescind and recover the

3  consideration paid for their shares, and hereby tender their common stock to the

4  defendants sued herein. Class members who have sold their common stock seek

5  damages to the extent permitted by law.

6       70.   This claim was brought within one year after the discovery of the untrue

7  statements and omissions in the Offering Documents and within three years after

8  Alliance shares was sold to the Class in connection with the Offering.

**COUNT II**
**Violation of §15 of the Securities Act**
**Against Defendants FAT Brands, FCCG, and the Individual Defendants**

11      71.   Plaintiff repeats and realleges the allegations contained above as if fully

12  set forth herein.

13      72.   This Count is brought pursuant to §15 of the Securities Act against

14  Defendant FAT Brands, Defendant FCCG, and the Individual Defendants.

15      73.   The Individual Defendants each were control persons of FAT Brands by

16  virtue of their positions as directors and/or senior officers of FAT Brands. Each of

17  these Defendants had the ability to influence the policies and management of FAT

18  Brands by their voting and control over statements made by FAT Brands in the

19  Offering Documents. The Individual Defendants also each had a series of direct

20  and/or indirect business and/or personal relationships with other directors and/or

21  officers and/or major shareholders of FAT Brands.

22      74.   FAT Brands controlled the Individual Defendants and all of its

23  employees.

24      75.   FCCG controlled FAT Brands prior to and following the Company's

25  IPO.  As conceded in the IPO Offering Documents, FAT Brands was at the time of its

26  IPO and would remain following the IPO a "controlled company," and that "[t]he

27

28

- 21 -
CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

stockholders of FCCG, including Mr. Wiederhorn, will indirectly benefit from the proceeds of this Offering."

76.   This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after the Company's securities were sold to the Class in connection with the IPO. It is therefore timely.

77.   By reason of the above conduct, for which the Company is primarily liable, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as the Company's pursuant to Section 15 of the Securities Action, 15 U.S.C. 77o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.   Determining that this action is a proper class action, certifying Plaintiff as a class representative under Federal Rule of Civil Procedure 23 and appointing Plaintiff's counsel Class Counsel;

B.   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.   Awarding rescission or a rescissory measure of damages; and

E.   Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    DATED: August 24, 2018                    Respectfully submitted,

2                                              **THE ROSEN LAW FIRM, P.A.**

3
                                               By: /s/Laurence M. Rosen
4                                              Laurence M. Rosen (SBN 219683)

5                                              355 South Grand Avenue, Suite 2450
                                               Los Angeles, CA 90071
6                                              Tel. (213) 785-2610

7                                              Fax: (213) 226-4684
                                               Email: lrosen@rosenlegal.com
8

9                                              **KASKELA LAW LLC**
                                               D. Seamus Kaskela (*pro hac vice*
10                                             forthcoming)

11                                             201 King of Prussia Road, Suite 650
                                               Radnor, PA 19087
12                                             Tel: (484) 258-1585

13                                             Email: skaskela@kaskelalaw.com

14                                             *Counsel for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS