1  Laurence M. Rosen, Esq. (SBN 219683)
2  THE ROSEN LAW FIRM, P.A.
3  355 South Grand Avenue, Suite 2450
   Los Angeles, CA 90071
4  Telephone: (213) 785-2610
   Facsimile: (213) 226-4684
5  Email: lrosen@rosenlegal.com
6
   *Lead Counsel for Lead Plaintiffs*
7
8  [additional counsel on signature page]

9               UNITED STATES DISTRICT COURT
10              CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM VIGNOLA, Individually and On Behalf of All Others Similarly Situated, | Case No.: 2:18-cv-07469-PSG-PLA |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| FAT BRANDS, INC., ANDREW A. WIEDERHORN, RON ROE, JAMES NEUHAUSER, EDWARD H. RENSI, FOG CUTTER CAPITAL GROUP INC., and TRIPOINT GLOBAL EQUITIES, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12

Lead Plaintiffs Charles Jordan and David Kovacs ("Plaintiffs") individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' first amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding FAT Brands, Inc. ("FAT Brands" or the "Company"), analyst reports, news articles and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

13

## **NATURE OF THE ACTION**

14
15
16
17

1.      This is a securities class action on behalf of all persons who purchased FAT Brands common stock pursuant to FAT Brands' October 23, 2017 initial public stock offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

18
19
20
21
22
23
24
25
26
27
28

2.      As alleged herein, Defendants are responsible for false and misleading statements and omitting material facts in connection with Fat Brands' IPO. Specifically, Defendants authorized or signed the Registration Statement for the IPO and an Offering Circular (collectively, the "Offering Documents") and/or participated in making false and misleading statements and omitting material facts in connection with the IPO roadshow. Accordingly, Plaintiffs bring claims against FAT Brands, certain of FAT Brands' executive officers and directors who signed the Offering Circular and/or authorized and/or participated in making the false or misleading statements and omissions contained therein and in connection with the IPO roadshow (as identified below), and Defendant TriPoint Global Equities, LLC ("TriPoint"),

pursuant to §§12 and 15 of the Securities Act. Section 12(a)(2) provides buyers of securities an express remedy for material misstatements or omissions made by any seller or solicitor in connection with the offer or sale of the issuer's securities involving a prospectus or oral communications, while § 15 extends joint and several liability to those who controlled any person or entity held liable under § 12(a)(2).

3.     FAT Brands' IPO was primarily a workaround by Defendant Fog Cutter Capital Group, Inc. ("FCCG") and its CEO, Defendant Andrew W. Wiederhorn, to go public without undergoing the scrutiny involved in a traditional public offering. Wiederhorn and FCCG had good reason to want to avoid scrutiny.

4.     Wiederhorn had previously pleaded guilty to two felonies and was sentenced to 18 months imprisonment and over $2 million in restitution and fines.

5.     FCCG had been publicly listed on NASDAQ, but was delisted for actions contrary to the public interest when it gave Wiederhorn a bonus matching his restitution payment as part of a financial package worth approximately $4.75 million upon his guilty plea and imprisonment, and on top of that allowed him to retain his titles and responsibilities with FCCG. FCCG was then delisted *again*, this time from the OTC Bulletin Board, when its Fatburger subsidiaries declared bankruptcy after FCCG was unable to obtain financing in connection with a string of acquisitions, not unlike the acquisition plan FAT Brands proposed to undertake.

6.     FCCG created FAT Brands as a vehicle to operate the same business and obtain public funding while avoiding the extra scrutiny and difficulty of a traditional public offering. FCCG created FAT Brands, "contributed" to FAT Brands its primary operating subsidiaries, Fatburger and Buffalo's Café, and in exchange it received a $30 million unsecured promissory note with a 10% interest rate (less $9.5 million which it received from FAT Brands' IPO proceeds) as well as $3.84 million in annual dividends, and retained an 80% equity interest in the Company. In 2014-2016, the operating

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    subsidiaries reported combined annual revenues no higher than $6.5 million in any
2    given year.

3        7.    FCCG opted to conduct FAT Brands' IPO as a Regulation A+ offering
4    instead of a traditional offering because a Regulation A+ offering involves a more
5    streamlined, expedited review process. In a Regulation A+ offering, a company is
6    required to make its offering memorandum public just 21 days prior to SEC
7    qualification, with a lower level of scrutiny than for a traditional public offering.

8        8.    Once the IPO was completed, raising gross proceeds of $24 million,
9    FCCG consolidated its equity stake in the Company. After the IPO, FCCG agreed to
10   convert the balance of its promissory note into 20,000 shares of FAT Brands preferred
11   stock and over one million shares of common stock. The balance of the note was
12   approximately $9.8 million, meaning it had collected approximately $10.7 million on
13   the note from FAT Brands, after receiving the initial $9.5 million in IPO proceeds.
14   FCCG also opted to reinvest its quarterly dividends into additional equity, obtaining
15   almost 500,000 additional shares in the first ten months of 2018 alone. The Company
16   has also publicly discussed merging FCCG into FAT Brands, which would complete
17   the backdoor process of regaining FCCG's public listing.

18       9.    In order to successfully consummate the FAT Brands offering,
19   Defendants made a number of material misleading statements and omissions in the
20   Company's Offering Documents and in roadshow presentations promoting the IPO.
21   Defendants failed to disclose and misrepresented that (1) sales growth had significantly
22   declined for Fatburger and for Ponderosa and Bonanza; (2) the fast-casual dining sector
23   that the Company championed was extremely saturated and facing significant
24   headwinds and a slowdown in growth; (3) FAT Brands' free cash flow was insufficient
25   to cover its $5 million annual dividend obligations without assuming more high-cost
26   debt; (4) Wiederhorn and his family owned 75% of FCCG, and thus 60% of FAT
27   Brands after the merger; (5) FCCG and the Wiederhorn family had already once run

28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   the Fatburger subsidiaries into bankruptcy in connection with the attempt to undertake
2   an acquisition spree much like the one they were undertaking at FAT Brands at the
3   time of the Company's IPO, resulting in FCCG's stock being delisted a second time;
4   and (6) FCCG had previously been delisted from NASDAQ in light of FCCG's one-
5   sided agreements with Wiederhorn, its controlling shareholder and CEO, allowing
6   Wiederhorn to exercise substantial influence over the company during his incarceration
7   and compensating him approximately $4.75 million to do so.

8       10.   Investors were fooled by Defendants' misleading disclosures and suffered
9   damages after purchasing FAT Brands common stock pursuant to the IPO. The price
10  of FAT Brands common stock has plummeted since the IPO and currently trades at less
11  than half its IPO price of $12.

12                        **JURISDICTION AND VENUE**

13      11.   The claims asserted herein arise under and pursuant to §§12(a)(2) and 15
14  of the Securities Act (15 U.S.C. §§77l(a)(2) and 77o).

15      12.   This Court has jurisdiction over this action pursuant to §22 of the
16  Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331.

17      13.   Venue is properly laid in this District pursuant to §22 of the Securities Act
18  and 28 U.S.C. §1391(b) as the Company's headquarters is located in this Judicial
19  District.

20      14.   In connection with the acts, conduct and other wrongs alleged in this
21  complaint, Defendants, directly or indirectly, used the means and instrumentalities of
22  interstate commerce, including but not limited to, the United States mails, interstate
23  telephone communications and the facilities of the national securities exchange.

24                              **PARTIES**

25      15.   Lead Plaintiff Charles Jordan purchased FAT Brands common stock
26  pursuant to the IPO and the Offering Circular and was damaged thereby.

27

28

1    16.    Lead Plaintiff David Kovacs purchased FAT Brands common stock
2  pursuant to the IPO and the Offering Circular and was damaged thereby.

3    17.    Defendant FAT Brands is an international franchising company that
4  acquires, markets, and develops fast casual and casual dining restaurant concepts,
5  including Fatburger, Buffalo's Café, Buffalo's Express, Ponderosa Steakhouse,
6  Bonanza Steakhouse, and Hurricane Grill. FAT Brands was created by FCCG, and was
7  the wholly-owned subsidiary of Defendant FCCG at the time of the IPO. Fatburger
8  North America, Inc. ("Fatburger"), is FAT Brands' flagship operating subsidiary.
9  FCCG acquired Fatburger in 2003, and reorganized Fatburger along with Buffalo's
10  Franchise Concepts Inc. ("Buffalo's Cafe") under FAT Brands in 2017. At the time of
11  the IPO, FAT Brands was the franchisor for only Fatburger and Buffalo's Café. FAT
12  Brands is a Delaware corporation with headquarters at 9720 Wilshire Blvd., Suite 500,
13  Beverly Hills, CA 90212. The Company's shares trade on NASDAQ under the ticker
14  "FAT."

15    18.    Defendant Andrew W. Wiederhorn ("Wiederhorn") has been FAT
16  Brands' President, Chief Executive Officer, and a member of its Board of Directors
17  since the Company's formation, including at the time of the Company's IPO.
18  Wiederhorn has also been the Chairman, CEO and controlling shareholder of FCCG at
19  all relevant times. FCCG owned 100% of FAT Brands' common stock prior to the
20  Company's IPO, and 80% after the IPO. Wiederhorn also has served as the Chairman
21  and CEO of Fatburger North America, Inc. since 2006, and held the same positions at
22  Buffalo's Franchise Concepts, Inc. since 2011. As one of FAT Brands' executives in
23  the IPO working group, Wiederhorn reviewed and approved, and participated in
24  making, statements to investors, including statements in the Offering Documents,
25  which he signed, and the Company's IPO roadshow. Wiederhorn participated in the
26  roadshow on behalf of FAT Brands and FCCG and pitched the IPO to investors,

27
28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

including through a live online "webinar." Wiederhorn received a $400,000 cash bonus and 15,000 shares of FAT Brands common stock for completing the IPO.

19.    Defendant Fog Cutter Capital Group Inc. was an Oregon-based company that, at the time of the IPO, owned 100% of FAT Brands' common stock and voting power. Following the IPO, FCCG retained 80% of FAT Brands' common stock and voting power.  Defendant Wiederhorn founded FCCG and was the chairman of its board of directors at the time of FAT Brands' IPO. Upon information and belief, Defendant Wiederhorn and his family owned 75% of FCCG shares. FCCG's common stock was previously listed on NASDAQ, but NASDAQ delisted FCCG for actions contrary to the public interest. FCCG then traded on over the counter ("OTC") markets, but was then delisted again from the OTC Bulletin Board in connections with the bankruptcies of FCCG's operating subsidiaries.

20.    Defendant Ron Roe was the Company's Chief Financial Officer at the time of the Company's IPO, and until August 16, 2018, when he became the Senior Vice President of Finance for the Company.[1] Roe is also the CFO of FCCG. Roe received a $300,000 cash bonus and 15,000 shares of FAT Brands common stock for completing the IPO.

21.    Defendants Wiederhorn and Roe are executives of FAT Brands who participated in the Company's IPO roadshow and are sometimes referred to herein as the "Executive Defendants."

22.    Defendant James Neuhauser has been a member of FAT Brands' Board since October 2017, and held that position at the time of the IPO. As a member of the Board, Neuhauser reviewed and approved, and participated in making, statements to

_____

[1] Rebecca D. Hershinger replaced Roe as the Company's Chief Financial Officer, effective August 16, 2018.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   investors in the Offering Documents, which he signed.[2] Neuhauser was also a member

2   of the Audit Committee of the FAT Brands' Board, and oversaw the Company's

3   financial reporting process and reviewed the Company's reports and financial

4   statements filed with the SEC.

5       23.    Defendant Edward H. Rensi is, and was at the time of the IPO, the

6   Chairman of FAT Brands' Board. Rensi served as a member of the Board since its

7   formation and became Chairman of the Board in October 2017. Rensi is the retired

8   president and CEO of McDonald's USA. Rensi also served as director and interim CEO

9   of Famous Dave's of America, Inc. As a member of the Board, Defendant Rensi

10  reviewed and approved, and participated in making, statements to investors in the

11  Offering Documents, which he signed.

12      24.    Defendants Wiederhorn, Roe, Neuhauser, and Rensi signed or authorized

13  the signing of the Offering Documents used to conduct the IPO. They knew and

14  intended that the Offering Documents would be used to promote the IPO and to solicit

15  investors to purchase shares in the IPO. Defendants Wiederhorn, Roe, Neuhauser, and

16  Rensi are sometimes referred to herein as "Individual Defendants."

17      25.    Defendant TriPoint is an investment banking firm that, along with its

18  crowd-funding subsidiary, Banq, served as the underwriter of the IPO, acting as both

19  Lead Manager and Book Runner. TriPoint participated in drafting and disseminating

20  the Offering Documents used to conduct the IPO, and participated in drafting and

21  making statements in connection with efforts to sell shares in the IPO, including the

22  Offering Documents, roadshow presentations, and other materials appearing on

23  TriPoint's and Banq's websites. TriPoint built the broker-dealer syndicate that handled

24

25  _____

26  [2] Defendants Neuhauser and Rensi signed the Offering Documents through the
    signature of Defendant Wiederhorn, who signed the Offering Documents both in his
27  own capacity as President and CEO and separately as attorney-in-fact on behalf of
    Defendants Neuhauser and Rensi.
28

the offering transactions. The Company paid TriPoint $1.8 million for its role in selling shares in the IPO, or 7.42% of the IPO's gross proceeds. TriPoint also obtained an agreement from FAT Brands to indemnify and hold TriPoint harmless from any liability under federal securities laws, and ensured prior to the IPO that FAT Brands had secured millions of dollars of coverage in directors' and officers' liability insurance.

## SUBSTANTIVE ALLEGATIONS

### Company Background

26.     FAT Brands is a franchisor. Rather than owning or operating actual restaurant locations, FAT Brands generates revenues primarily by charging its franchisees an initial franchise fee and ongoing royalty fees. At the time of the IPO, FAT Brands was the franchisor of two fast casual restaurant brands: Fatburger and Buffalo's Cafe/Buffalo's Express. According to the IPO Offering Documents, at the time of the IPO FAT Brands "intend[ed] to complete the acquisitions [of] Ponderosa and Bonanza [steakhouses], including one company-owned restaurant, concurrently with the consummation of" the IPO, which would add a third fast-casual restaurant brand concept to FAT Brands' portfolio. At the time of its IPO, FAT Brands' portfolio of restaurants spanned 176 locations across seven states and 18 countries.

27.     As a franchisor, FAT Brands generally did not own or operate actual restaurant locations. Instead, FAT Brands historically generated relatively strong margins (compared to other restaurant companies) by charging franchisees an initial franchise fee and ongoing royalty payments. According to the Offering Documents, FAT Brands' "asset light franchisor model provide[d] the opportunity for strong profit margins and an attractive free cash flow profile while minimizing restaurant operating company risk, such as long-term real estate commitments or capital investments."

28.     Prior to the IPO, FAT Brands' flagship operating subsidiary, Fatburger, accounted for the overwhelming majority of the Company's locations, revenues and profits, with 157 Fatburger locations across five states and 18 countries.

29.     FAT Brands' other operating subsidiary, Buffalo Cafe, accounted for an additional 19 locations at the time of the IPO. Buffalo's Express, which is a smaller, fast-casual variant of Buffalo's Cafe, was co-branded with Fatburger so that at the time of the IPO there were an additional 68 co-branded Buffalo's Express/Fatburger locations.

30.     FAT Brands also had plans to add more restaurant brands to its portfolio at the time of the IPO. According to the Offering Circular, the Company intended to complete the acquisition of Homestyle Dining LLC, which owned Ponderosa Franchising Company and Bonanza Restaurant Company (together, "Ponderosa & Bonanza") concurrently with the consummation of the IPO. At the time of the IPO there were 100 Ponderosa and 20 Bonanza restaurants operating under franchise and sub-franchise agreements in 19 states, and in countries as varied as Canada, the United Arab Emirates, Egypt, Qatar, Taiwan, as well as one company-owned Ponderosa restaurant in the United States.

## The Checkered Past of Wiederhorn and FCCG

31.     In 2004, Defendant Wiederhorn pleaded guilty to two felony charges in connection with his former company, the predecessor to FCCG, and the collapse of Capital Consultants, LLC, an investment advisor for union pension plans which lost approximately $350 million in union pension funds due to fraudulent and failed investments. Wiederhorn pleaded guilty to (1) giving an illegal gratuity to Capital Consultants CEO Jeff Grayson; and (2) filing a false tax return. He was sentenced to 18 months in prison and was ordered to pay a $25,000 fine and $2 million in restitution to the Capital Consultants receiver.

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

32.    The day before Defendant Wiederhorn entered into the plea deal, he signed an agreement with FCCG, under which FCCG, while acknowledging the plea agreement and imminent incarceration, nonetheless provided Wiederhorn with approximately $4.75 million in benefits. Wiederhorn's agreement with FCCG stated that (1) he would retain his titles and responsibilities with FCCG; (2) he would receive his annual salary of $350,000, bonuses, and other benefits while imprisoned, and (3) FCCG would pay Wiederhorn a $2 million "leave of absence payment," which matched precisely the amount he was ordered to pay in restitution. FCCG entered the agreement ostensibly to retain Wiederhorn's "good will, cooperation and continuing assistance, and in recognition of Wiederhorn's past service to the Company, to help avoid litigation and for . . . other reasons." FCCG knew Wiederhorn would use the $2 million payment to pay his court-ordered restitution. FCCG disclosed this information and the $4.75 million cost of its agreement with Wiederhorn in its SEC filings. The same year that FCCG entered into the deal with Wiederhorn, it reported a net loss of $3.93 million.

33.    FCCG had also previously entered into an agreement with Wiederhorn to amend his employment contract in 2003, more than two years *after* it had known about the government investigation of Wiederhorn that led to his eventual guilty plea. Under the 2003 amendment, if FCCG terminated Wiederhorn without cause, it would have owed him three times his annual salary, three times his largest annual bonus from the last three years, unreimbursed business expenses, and accrued but unpaid base salary and bonuses – or approximately $6 million in June 2004 – all as a lump-sum payment within ten days. Before the 2003 amendment, termination "for cause" included any felony conviction other than a traffic offense. The 2003 amendment changed the relevant provision to limit the definition of a "for cause" termination of Wiederhorn to only a conviction for a felony *involving FCCG*.

34.    FCCG had been listed on the NASDAQ, but in July 2004, NASDAQ delisted FCCG. NASDAQ decided that it was contrary to the public interest for FCCG

1    to remain listed in light of FCCG's patently one-sided agreements with Wiederhorn,
2    FCCG's controlling shareholder and CEO, and because Wiederhorn was not only
3    exercising substantial influence over the company during his incarceration, but
4    receiving handsome compensation for it.

5           35.    On August 15, 2003, FCCG completed a $7 million investment and
6    financing package for Fatburger, acquiring the remainder of the company in 2011.
7    Defendant Wiederhorn founded and controlled FCCG as its majority shareholder. He
8    became Fatburger's CEO in 2006 and continued to serve as FCCG's Chairman and
9    CEO, as well as Fatburger's CEO and President, through the time of FAT Brands' IPO.

10          36.    In 2006, after Defendant Wiederhorn's appointment as CEO of Fatburger,
11   Fatburger was barred from selling additional franchises in California for several
12   months due to Wiederhorn's prior felony convictions.

13          37.    Then, after borrowing approximately $3.85 million from financier
14   General Electric Capital Business Asset Funding Corp. ("GE"), on or about March 31,
15   2009, several Fatburger subsidiaries received notices of default and demand for
16   payment from GE. The Fatburger subsidiaries, including Fatburger Restaurants of
17   California and Fatburger Restaurants of Nevada, were unable to repay GE and filed for
18   Chapter 11 bankruptcy protection on April 7, 2009. Fatburger sought to restructure the
19   GE loans as a part of the Chapter 11 bankruptcy cases.

20          38.    On April 8, 2009, after the bankruptcy filings, FCCG announced that it
21   had failed to satisfy a listing requirement of the OTC Bulletin Board, where its stock
22   had been listed after being delisted from NASDAQ. FCCG had failed to timely file its
23   financial reports with the SEC, and announced that it expected its stock to no longer be
24   listed on the OTC Bulletin Board. The approximately eight million outstanding shares
25   of FCCG common stock became worthless.

26          39.    In 2011, FCCG acquired the 25-unit Buffalo's Cafe brand and converted
27   both the Fatburger and Buffalo's Cafe brands into a franchisor model. After acquiring
28

1   Buffalo's Cafe, FCCG developed the Buffalo Express concept and rolled out
2   cobranded Fatburger/Buffalo Express restaurants. FCCG reorganized Fatburger and
3   Buffalo's Café under FAT Brands Inc. in 2017 for the purpose of effectuating the IPO.

4       40.    In March 2017, FCCG agreed to acquire Homestyle Dining LLC, the
5   franchisor of the Ponderosa & Bonanza restaurants, planning to use the proceeds from
6   the anticipated FAT Brands IPO to fund the acquisition.

7                       **FCCG's Control of FAT Brands**

8       41.    At the time of the IPO, FCCG owned all eight million shares of FAT
9   Brands common stock and controlled 100% of its voting power. FAT Brands was
10  formed as a Delaware corporation on March 21, 2017, for the purposes of completing
11  the IPO, acquiring new brands, and continuing the businesses of Fatburger and
12  Buffalo's Café which were then being conducted as subsidiaries of FCCG.

13      42.    At the time of the IPO, Defendant Wiederhorn was serving as President
14  and CEO of FAT Brands as well as the Chairman and CEO of FCCG. Defendant Roe,
15  then the Senior Vice President and CFO of FAT Brands, also served as CFO of FCCG
16  at the time of the IPO.

17      43.    The Wiederhorn family was, and remains, intricately involved in the
18  Company's business and ownership. Donald Berchtold is the father of Tiffany
19  Wiederhorn, to whom Andrew Wiederhorn was married for thirty years. Andrew
20  Wiederhorn began working for Berchtold when Wiederhorn was 13. Berchtold served
21  as Senior Vice President of Wilshire Financial Services Group ("WFSG"), which
22  Andrew Wiederhorn founded. Andrew Wiederhorn also served as the Chairman, CEO,
23  Secretary, and Treasurer for WFSG. Berchtold serves as President and Chief Operating
24  Officer of Fatburger, as well as President and COO of FCCG. Berchtold also served as
25  FCCG's CEO during Wiederhorn's imprisonment.

26      44.    Wiederhorn's twin sons, Thayer Wiederhorn and Taylor Wiederhorn, are
27  also senior executives at the Company, serving as FAT Brands' Chief Marketing

28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   Officer and Chief Development Officer, respectively. Wiederhorn's daughter, Madison
2   Wiederhorn, serves as the Company's Director of Training, and his son, Mason
3   Wiederhorn, serves as Creative Director for the Company.

4       45.    Upon information and belief, the Wiederhorn family owned 75% of
5   FCCG at the time of the IPO. The Wiederhorn family's 75% ownership is corroborated
6   by an article published on the website IPO Edge, which states: "The key is to simplify
7   the company's shareholder structure, which currently consists of 80% ownership by
8   Fog Cutter Capital Group (ticker: FCCG), a vehicle that is 75% owned by the family
9   office of FAT CEO Andrew Wiederhorn."[3] Thus, after the IPO, the Wiederhorn family
10  owned at least a 60% interest in FAT Brands, through FCCG.

11      46.    FCCG, through Defendants Wiederhorn, Roe and other FCCG affiliates,
12  planned to conduct FAT Brands' IPO as a Regulation A+, or "Reg A+," offering. Under
13  Title IV of the 2015 Jumpstart Our Business Startups (JOBS) Act, a private company
14  can raise public funding through a Reg A+ offering. A Reg A+ offering involves a
15  relatively streamlined, expedited review process. In a Reg A+ offering, a company is
16  required to make its offering memorandum public just 21 days prior to SEC
17  qualification. In light of Wiederhorn's felonies and prison sentence and FCCG's *two*
18  prior delistings, Wiederhorn and FCCG opted to pursue a Reg A+ offering in lieu of a
19  traditional IPO to avoid the heightened scrutiny that a traditional IPO would entail.

20      47.    Wiederhorn and FCCG and its affiliates planned for FAT Brands to sell
21  two million shares of the Company's common stock through a Reg A+ offering to
22  investors for $12 per share, raising $24 million in gross proceeds. FCCG would retain
23  its eight million shares and thus 80% of the voting power of FAT Brands. FCCG also
24  "contributed" its two operating subsidiaries, Fatburger and Buffalo's Café, to the

25

26

27  [3] *Available at* http://ipo-edge.com/2018/05/03/investors-might-have-overlooked-this-
28  juicy-merger-on-fats-menu/

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   Company in connection with the IPO, in exchange for a $30 million promissory note.
2   According to the Offering Circular, the Company planned to use $10.55 million of the
3   IPO proceeds to purchase Ponderosa & Bonanza, and to send $9.5 million of the
4   proceeds to FCCG to partially repay the debt. After the repayment of the $9.5 million
5   to FCCG, FAT Brands would assume a $20.5 million debt obligation to FCCG, which
6   would carry a 10% interest rate and mature five years following the IPO.

7   48.   According to the Offering Circular, FAT Brands intended to pay annual
8   dividends of $0.48 per share. Notably, FCCG stood to receive the lion's share of those
9   stock dividends, approximately $3.84 million annually.

10  **The Offering Documents and Roadshow Documents Contained Misleading**
11  **Statements and Omissions of Material Fact**

12  49.   On or about May 5, 2017, FAT Brands filed its first draft registration
13  statement with the SEC on Form 1-A (File No. 024-10737). Following several
14  amendments made in response to comments received from the SEC, the Form 1-A was
15  deemed qualified by the SEC on October 3, 2017 and utilized for the IPO. The
16  registration statement and Offering Circular included therein were signed by
17  Defendants Wiederhorn, Roe, Neuhauser, and Rensi.

18  50.   By August 3, 2017 at the latest, Defendant FAT Brands, the Executive
19  Defendants, and TriPoint commenced a multi-city roadshow to market FAT Brands
20  common stock to the investing public using the Offering Documents. The roadshow
21  was completed on or about October 20, 2017, and the IPO was priced at $12 per share.
22  Due to their extensive marketing efforts, Defendants raised $24 million through the
23  sale of two million shares of FAT Brands common stock.

24  51.   As part of the IPO roadshow, on or about September 19, 2017, Defendants
25  conducted a live interactive webinar, featured on VirtualInvestorConference.com, to
26  promote FAT Brands' anticipated IPO. Defendant Wiederhorn, as CEO of both FAT
27  Brands and FCCG, FAT Brands' controlling shareholder, hosted the webinar together
28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

with Mark Elenowitz, the CEO of TriPoint, and answered questions from potential investors about FAT Brands and the IPO. The webinar included a video presentation that contained material misstatements and omissions that defendants participated in making. At the beginning of the Webinar, Elenowitz directed investors to the Banq web portal, through which investors could access the Offering Documents and initiate the process to purchase shares in the IPO.

52.     For example, during the webinar, Defendant Wiederhorn discussed FCCG's holdings in FAT Brands, and how FCCG would continue to hold at least 80% of FAT Brands' stock after the IPO. Wiederhorn showed the following slide during the presentation, explaining that FCCG would hold 80% of FAT Brands' common stock and outside investors would hold 20% of the Company's common stock:



53.     The presentation and statements to investors contained material misstatements and omissions. Defendants failed to disclose during the webinar was that

the Wiederhorn family's ownership of FCCG was actually 75% - meaning the Wiederhorn family, not just FCCG, would be FAT Brands' controlling shareholder owners following the IPO. This omission rendered Defendants' statements concerning FCCG's controlling ownership stake in FAT Brands misleading.

54.     Also during the webinar, Wiederhorn flaunted FAT Brands' "asset-light business model" and explained that FAT Brands, as a franchisor, was not making significant capital expenditures, and was thus maintaining an attractive free cash flow profile. Defendant Wiederhorn presented the following slide regarding FAT Brands' asset-light model:



55.     However, the presentation and these statements to investors also contained material misstatements and omissions.  For example, there was no mention of the fact that FAT Brands' then-present free cash flow was not enough to cover its outsized dividend, which at $0.48 per share annually, would cost FAT Brands approximately $5 million to service. This was critical because FAT Brands was

1   assuming $20.5 million in high-interest debt to FCCG as part of the IPO, increasing its

2   leverage and debt servicing costs. Without sufficient free cash flow to cover its

3   dividend, the Company would have to take on even more high-interest debt to continue

4   to pay its dividends while it funded subsequent additional brand acquisitions, such as

5   its $12.5 million acquisition of Hurricane Grill.

6       56.    Also during the webinar, Wiederhorn and Elenowitz fielded real-time

7   questions from investors. In response to the question "what is [FAT Brands'] EBITDA

8   margin," Wiederhorn replied "almost 60%," adding that the EBITDA margin is "very,

9   very strong." However, in reality both the Fatburger and Homestyle Dining (Ponderosa

10  & Bonanza) brands were on track to report lower revenues in 2017 than they did in

11  2016. This meant that FAT Brands' profit margins were on the decline at the time of

12  the IPO. The lower margins, coupled with the newly increased leverage due to the high-

13  cost debt obligations, put FAT Brands on course to report lower 2017 profits. This

14  rendered the statements touting FAT Brands' margins materially misleading, as sales

15  growth for the existing brands' stores had already plummeted and the Ponderosa &

16  Bonanza acquisition would further diminish the Company's overall sales growth and

17  profits, and thus its margins.

18      57.    In addition to the roadshow presentations and statements, the Offering

19  Documents were negligently prepared and, as a result, also contained false and

20  misleading statements of material facts, omitted to state other facts necessary to make

21  the statements made not misleading, and were not prepared in accordance with the rules

22  and regulations governing their preparation.

23      58.    Despite having reported $1.7 million in net income on $4.3 million of

24  revenue during the first six months of 2017 – a 40% net margin and an astounding 62%

25  operating margin, which margins were used to price the shares sold in the IPO – with

26  both the Fatburger and Ponderosa & Bonanza brands on track to report lower revenues

27  in 2017 than they did in 2016 the combined company's profit margins were actually on

28

1    the decline at the time of the IPO. This, when coupled with the increased leverage from

2    the FCCG debt, put the Company on course to report lower 2017 profits. This trend

3    rendered statements in the Offering Documents such as "between 2012 and 2016,

4    unadjusted for the acquisition of Ponderosa and Bonanza, the company achieved

5    compound annual growth rates in net revenue, net income, and EBITDA of 9.9%,

6    40.0% and 35.3%, respectively, reflecting consistent yearly growth over this period,"

7    materially misleading because revenue and income growth for the existing brands'

8    stores had already plummeted, and the Ponderosa & Bonanza acquisition would further

9    diminish growth and profits.

10       59.    By the time of the IPO, after having agreed to pay $10.55 million to

11   acquire Ponderosa & Bonanza in March 2017, FAT Brands had received internal

12   reports and data indicating that the brands' revenues were not growing anywhere near

13   as robustly FCCG had projected when it was negotiating the acquisition.

14       60.    On December 4, 2017, the Company filed a quarterly report for the quarter

15   ended September 24, 2017 with the SEC on Form 10-Q ("17Q3 10-Q"). In the 17Q3

16   10-Q, the Company revealed that Fatburger's revenues and net income for the prior

17   three quarters had decreased by 21.1% and 20.1%, respectively from the previous year.

18   For the third quarter alone, Fatburger's revenues and net income had decreased 33.4%

19   and 39.5%, respectively, from the previous year's third quarter.

20       61.    The 17Q3 10-Q also revealed that Ponderosa's revenues and net income

21   for the prior three quarters had decreased by 7% and 18%, respectively from the

22   previous year. For the third quarter alone, Ponderosa's revenues and net income had

23   decreased 6.7% and 18.7%, respectively, from the previous year's third quarter.

24       62.    Finally, the 17Q3 10-Q revealed that the Company had only $1.15 million

25   in cash on hand at the end of the third quarter. Thus, the 17Q3 10-Q demonstrated that

26   at the end of the third fiscal quarter of 2017, ***just one month prior to the IPO***, the

27   Company's two main subsidiaries coming out of the IPO, Fatburger and Ponderosa,

28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  had both experienced substantial decreases in revenue and net income from the
2  numbers touted by Defendants in the Offering Documents and in the roadshow
3  presentations. As a result of the diminished sales and its plan to pay FCCG $9.5 million
4  of the offering proceeds, the Company did not have sufficient cash on hand to service
5  its massive dividend without taking on significant amounts of additional high-cost debt.

6      63.    Although the Offering Documents repeatedly referenced how FAT
7  Brands' "Capital Light Business Model [Drove] High Free Cash Flow Conversion" by
8  "requiring minimal capital expenditures," the Offering Documents failed to disclose
9  that FAT Brands' then-present free cash flow was not enough to cover its outsized
10 dividend, which, at $0.48 per share annually, would cost the Company $5 million to
11 service. This shortcoming was critical because FAT Brands was assuming $20.5
12 million in high-cost debt to FCCG as part of the IPO, increasing its leverage and thus
13 debt servicing costs. Defendants failed to disclose that the Company would have to
14 take on additional high-cost debt in order to cover its dividend payments and to finance
15 the additional acquisitions it intended to pursue.

16     64.    Indeed, at the time of the IPO FAT Brands also planned to acquire another
17 restaurant brand immediately after the IPO. The Offering Documents expressly stated
18 that "[i]n addition to our pending acquisition of Ponderosa and Bonanza, as of the date
19 of this Offering Circular we have entered into a letter of intent to acquire an additional
20 restaurant concept with approximately 60 franchised stores for approximately
21 $11,000,000, and are in discussions to acquire another restaurant concept with
22 approximately 50 stores for a purchase price in the range of $26-30 million. We intend
23 to finance future acquisitions through a combination of borrowings under a proposed
24 new credit facility and by issuing new equity securities, including preferred stock if
25 available on terms satisfactory to us."

26     65.    In November 2017, FAT Brands announced the acquisition of Hurricane
27 Grill & Wings ("Hurricane Grill"), for $12.5 million. The Company's Hurricane Grill

28

1    acquisition, quick on the heels of its acquisition of Ponderosa & Bonanza, strained the

2    Company's marginal cash position and forced the Company to take on even more high-

3    priced debt. Due to the lack of cash on hand and difficulties securing financing on

4    palatable terms, FAT Brands was not able to close on the Hurricane Grill acquisition

5    until June 2018, despite initial representations that the deal would close at the end of

6    2017. In fact, according to the Company's annual report for 2017, filed on Form 10-K

7    with the SEC on April 2, 2018, the Company reported having just $32,000 in cash on

8    hand at the end of 2017, less than three months after the IPO.

9         66.    While the Offering Documents stated that the "existing markets for

10   Fatburger, Buffalo's Cafe, Buffalo's Express, and Ponderosa and Bonanza locations

11   are far from saturated and can support a significant increase in units," in reality, at the

12   time of the IPO the "fast-casual" dining sector which FAT Brands had targeted with its

13   franchise models was in fact extremely saturated and the sector as a whole was facing

14   significant headwinds and a slowdown in growth. For example, by 2017, fast-casual

15   sales growth in the United States had dropped to around 6%, as compared to 8% growth

16   in 2016, and between 10%-11% growth in each of the previous five years. Additionally,

17   a number of notable fast-casual dining concepts had posted significant losses leading

18   up to the time of the IPO, leading some businesses to close locations (including Qdoba,

19   Pie Five, Noodles & Co., and Pollo Tropical) and others to file for bankruptcy (Cosi,

20   Rita Restaurant Corp., and Garden Fresh Corp.). One of the principal reasons for the

21   slowdown was that customers preferred cheaper and quicker dining options, including

22   traditional fast-food chains, over fast-casual brands – a material trend for a company

23   such as FAT Brands that championed fast-casual concepts. Defendants' knowledge of

24   this trend conflicted with their statements concerning the overall outlook for the

25   markets for their franchised fast-casual brands, rendering their statements misleading.

26        67.    Additionally, the Offering Documents failed to disclose the bankruptcies

27   filed by several of the Fatburger subsidiaries in 2009. The Offering Documents

28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    disclosed that Rensi filed for Chapter 11 bankruptcy protection in October 2015, and
2    that WFSG, which Wiederhorn founded and served as CEO, underwent a pre-packaged
3    bankruptcy in November 1998 – more than ten years before the Fatburger subsidiaries'
4    bankruptcies. The Offering Documents also did not disclose that FCCG, the
5    Company's controlling shareholder, had previously had its stock delisted (for the
6    second time) in connection with those bankruptcies. This information would have been
7    material to investors, particularly given that the bankruptcies stemmed from FCCG's
8    inability to procure financing for an acquisition spree similar to that which the same
9    management planned for FAT Brands. Defendants' disclosure of the Rensi and WFSG
10   bankruptcies and not the Fatburger bankruptcies or FCCG's subsequent delisting gave
11   the misleading impression that Defendants disclosed all bankruptcies of FAT Brands'
12   related parties and the material consequences thereof.

13        68.    In November 2009, the Fatburger subsidiaries that entered Chapter 11
14   bankruptcy filed a "Summary of the Circumstances that Led to the Filing of the
15   Debtors' Chapter 11 Cases." In the Summary, the Fatburger subsidiaries stated that the
16   subsidiaries of Fatburger, which was run by Defendant Wiederhorn and Berchtold and
17   83% owned by FCCG at the time, had "beg[u]n to experience financial problems as a
18   result of: (1) a shortage in available restaurant financing, and (2) a decline in same store
19   sales over the past three years." The Fatburger subsidiaries had been forced to borrow
20   from GE in order to finance an acquisition spree, but when GE refused to continue
21   lending to them, "[t]he Debtors and their affiliates were not able to find alternate
22   financing and were forced to finance the expenses … from their existing cash flow."
23   "This strain on existing cash flow caused the Debtors to fall behind on their accounts
24   payable and real property lease obligations," forcing them into bankruptcy.

25        69.    At the time of the IPO, the exact same management team (FCCG,
26   Wiederhorn, and Berchtold) that oversaw Fatburger in 2009 was in the midst of yet
27   another acquisition spree. It would have been material to investors to know of the
28

1  management team's prior inability to obtain financing in connection with an acquisition

2  spree, which had resulted in Fatburger subsidiaries filing for bankruptcy, and

3  ultimately, in FCCG being delisted for a second time.

4      70.    The Offering Documents quietly disclosed Defendant Wiederhorn's

5  guilty plea and incarceration, artfully avoiding any use of the word "felonies."

6  However, they misleadingly omitted the fact that FCCG was delisted from NASDAQ

7  due to FCCG's patently one-sided agreements with Wiederhorn, signed in light of the

8  investigation which led to Wiederhorn's guilty plea on the two felony counts, and the

9  fact that Wiederhorn was exercising substantial influence over FCCG during his

10  incarceration and receiving approximately $4.75 million in compensation for his

11  troubles.

12      71.    Although the Offering Documents stated that Defendant "Wiederhorn

13  beneficially own[ed] 38.2% of FCCG, and disclaim[ed] beneficial ownership of the

14  Company held by FCCG except to the extent of his pecuniary interest in FCCG," the

15  Offering Documents omitted the fact that Wiederhorn's family actually owned 75% of

16  FCCG - meaning that Wiederhorn's family, not just FCCG, would be FAT Brands'

17  controlling shareholder owners following the IPO, with at least a 60% stake in the

18  Company.

19      72.    In connection with the IPO roadshow, Defendants also disseminated to

20  investors an "Offering Summary," which provided information about the Company and

21  the IPO. The Offering Summary was negligently prepared and, as a result, also

22  contained misleading statements of material facts or omitted to state other facts

23  necessary to make the statements made not misleading, and was not prepared in

24  accordance with the rules and regulations governing its preparation.

25      73.    Specifically, the Offering Summary featured a "FAT Brands Overview,"

26  which represented that the Company's "asset light franchisor model provides the

27  opportunity for strong profit margins and attractive free cash flow while minimizing

28

restaurant operating company risk, such as long-term real estate commitments and capital investments." Also, the "Investment Highlights" section of the Offering Summary stated that the Company's "[a]sset light business model drives free cash flow conversion and consistent profitability." The Offering Summary omitted the material fact that FAT Brands' then-present free cash flow was not enough to cover its dividend, which would require the Company to take on additional high-cost debt in order to finance the dividend and its anticipated future acquisitions, increasing its leverage and thus debt servicing costs.

74.   The statements referenced above in ¶¶ 49-73 were each materially false and misleading because they failed to disclose or misrepresented the following adverse facts that existed at the time of the IPO:

     a.   FAT Brands' main operating subsidiaries' sales growth had significantly declined;

     b.   Sales growth at Ponderosa & Bonanza was significantly below that which FAT Brands had believed it was when it agreed to acquire those brands in March 2017;

     c.   The fast-casual dining sector was extremely saturated and facing significant headwinds and a slowdown in growth;

     d.   FAT Brands' free cash flow was less than its approximately $5 million annual dividend obligations;

     e.   FCCG and Wiederhorn had already once run the Fatburger subsidiaries into bankruptcy in connection with the attempt to undertake an acquisition spree much like the one they planned to undertake at FAT Brands, resulting in FCCG's stock being delisted a second time; and

     f.   FCCG had previously been delisted from NASDAQ in light of FCCG's patently one-sided agreements with Wiederhorn, its controlling shareholder and CEO, and because Wiederhorn was exercising substantial

1   influence over the company during his incarceration and receiving
2   approximately $4.75 million in compensation for it.

3   75.   The SEC's Instructions to Form 1-A apply to the Offering Documents.
4   Pursuant to Item 7(a)(2) of the Instructions to Form 1-A, issuers must "describe those
5   distinctive or special characteristics of the issuer's operation or industry that are
6   reasonably likely to have a material impact upon the issuer's future financial
7   performance." Item 9(d) of the Instructions to Form 1-A states that issuers are also
8   required to "identify the most significant recent trends in production, sales and
9   inventory, the state of the order book and costs and selling prices since the latest
10   financial year." Moreover, they "also must discuss, for at least the current financial
11   year, any known trends, uncertainties, demands, commitments or events that are
12   reasonably likely to have a material effect on the issuer's net sales or revenues, income
13   from continuing operations, profitability, liquidity or capital resources, or that would
14   cause reported financial information not necessarily to be indicative of future operating
15   results or financial, condition."

16   76.   At the time of the IPO, unbeknownst to investors, FAT Brands' business
17   was impacted by known adverse events, trends, and uncertainties, namely that: (i) FAT
18   Brands' Fatburger subsidiaries' organic sales growth was declining and the sales
19   growth at Ponderosa & Bonanza was much lower than FCCG had presumed; (ii) FAT
20   Brands' cashflow was constrained and limited, requiring the Company to take on high-
21   cost debt to cover its outsized dividend obligations; and (iii) the fast-casual dining
22   sector was facing significant headwinds and a slowdown in growth, which adversely
23   impacted FAT Brands' financial growth and prospects. These adverse events, trends,
24   and uncertainties were reasonably likely to have a material impact on the Company's
25   profitability and were required to be disclosed in the Offering Documents. Yet
26   Defendants failed to disclose these adverse trends in the Offering Documents.

27
28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

**Defendant TriPoint's Liability**

2      77.    TriPoint arranged the roadshow leading up to the IPO. During the
3  roadshow, TriPoint and the Executive Defendants made presentations to potential
4  investors about the Company, its operations, and its financial prospects. TriPoint also
5  organized a live interactive webinar during which Wiederhorn and the CEO of TriPoint
6  presented information about FAT Brands and the offering to investors. TriPoint and
7  Banq also created websites soliciting investments in the FAT Brands IPO that were
8  accessible from TriPoint's and Banq's own home pages. TriPoint also participated in
9  scripting and creating videos about FAT Brands and its IPO, and made them accessible
10 from the Banq website, which also allowed investors to view the Offering Documents,
11 open an account with Banq, and purchase shares of FAT Brands. Banq's online web
12 portal, created and designed at the direction of TriPoint, provided investors direct
13 access to information about the IPO, including the Prospectus, and the ability to initiate
14 a purchase in the IPO. The IPO was sold through TriPoint's and Banq's websites, and
15 TriPoint authorized, approved, participated in making, and communicated the
16 statements in the roadshow videos to investors who purchased FAT Brands shares in
17 the IPO through TriPoint's and Banq's websites.

18     78.    TriPoint assisted the Company and the Individual Defendants in planning
19 the IPO. During that process, TriPoint purportedly conducted a due diligence
20 investigation into FAT Brands' business and operations. TriPoint was required to
21 undertake the due diligence investigation in order to engage in the IPO. During the
22 course of its investigation TriPoint had continual access to confidential corporate
23 information concerning the Company's operations and financials and maintained
24 constant contact and communications with the Company. TriPoint also met with the
25 Company's employees and executives during drafting sessions starting no later than
26 June 2017. During the drafting sessions TriPoint discussed with the Company, among
27 other things, the strategy to consummate the IPO, the statements and disclosures

28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    included in the Offering Documents and in marketing efforts to promote the IPO, and

2    the Company's responses to the SEC's comments concerning the SEC's review of the

3    draft Offering Documents. Therefore, TriPoint knew or should have been aware of the

4    material misleading statements and omissions detailed herein. TriPoint caused the

5    Offering Documents to be filed with the SEC and declared qualified in connection with

6    offers and sales thereof, including to Plaintiffs and the Class (as defined below).

7       79.   The IPO was successful for FAT Brands and TriPoint, who sold two

8    million shares of FAT Brands common stock to public investors at $12 per share,

9    raising $24 million in gross proceeds ($22.2 million net of underwriting fees and IPO

10   costs).

11      80.   The price of FAT Brands common stock has plummeted since the IPO and

12   currently trades at approximately $5.84 per share, down over 50% from the Company's

13   $12 IPO price just over one year earlier.

14                      **CLASS ACTION ALLEGATIONS**

15      81.   Plaintiffs bring this action as a class action pursuant to Federal Rule of

16   Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than

17   defendants who purchased FAT Brands common stock pursuant to the Offering

18   Documents issued in connection with the Company's IPO and who were damaged

19   thereby (the "Class"). Excluded from the Class are Defendants, the officers and

20   directors of the Company, members of the Individual Defendants' immediate families

21   and their legal representatives, heirs, successors or assigns and any entity in which the

22   officers and directors of the Company have or had a controlling interest.

23      82.   The members of the Class are so numerous that joinder of all members is

24   impracticable. Since the IPO, the Company's securities were actively traded on

25   NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this

26   time and can be ascertained only through appropriate discovery, Plaintiffs believe that

27   there are hundreds, if not thousands of members in the proposed Class. Record owners

28

and other members of the Class may be identified from records maintained by FAT Brands or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

83.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

84.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

85.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether Defendants issued materially false and misleading statements;

b.    whether the Offering Documents were negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein;

c.    whether other statements issued by Defendants were materially misleading and/or omitted material information;

d.    the extent to which members of the Class have sustained damages and the proper measure of damages

86.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members

1  of the Class to individually redress the wrongs done to them. There will be no difficulty

2  in the management of this action as a class action.

### COUNT I
### Violations of §12(a)(2) of the Securities Act
### <u>Against Defendants FAT Brands, FCCG, the Executive Defendants,</u>
### <u>and TriPoint</u>

6        87.    Plaintiffs repeat and reallege the allegations contained above as if fully set

7  forth herein.

8        88.    By means of the defective Offering Documents and other statements made

9  in connection with the roadshow, Defendant FAT Brands, Defendant FCCG, the

10  Executive Defendants and TriPoint promoted and sold FAT Brands' common stock to

11  Plaintiffs and other members of the Class.

12        89.    The Offering Documents and roadshow contained untrue statements of

13  material fact, and/or concealed or failed to disclose material facts, as detailed above.

14  These Defendants owed Plaintiffs and the other members of the Class who purchased

15  FAT Brands common stock pursuant to the Offering Documents the duty to make a

16  reasonable and diligent investigation of the statements contained in the Offering

17  Documents to ensure that such statements were true and that there was no omission to

18  state a material fact required to be stated in order to make the statements contained

19  therein not misleading. These defendants, in the exercise of reasonable care, should

20  have known of the misstatements and omissions contained in the Offering Documents

21  as set forth above.

22        90.    Plaintiffs did not know, nor in the exercise of reasonable diligence could

23  Plaintiffs have known, of the untruths and omissions contained in the Offering

24  Documents and roadshow presentation at the time Plaintiffs acquired FAT Brands

25  common stock.

26        91.    By reason of the conduct alleged herein, each of the Defendants named in

27  this Count violated §12(a)(2) of the Securities Act. As a direct and proximate result of

28

such violations, Plaintiffs and the other members of the Class who purchased FAT Brands common stock pursuant to the Offering Documents sustained substantial damages in connection with their purchases of FAT Brands stock. Accordingly, Plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

92. This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after FAT Brands shares were sold to the Class in connection with the IPO.

## COUNT II
### Violation of §15 of the Securities Act
### <u>Against Defendants FAT Brands, FCCG, and the Individual Defendants</u>

93. Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

94. This Count is brought pursuant to §15 of the Securities Act against Defendant FAT Brands, Defendant FCCG, and the Individual Defendants.

95. The Individual Defendants each were control persons of FAT Brands by virtue of their positions as directors and/or senior officers of FAT Brands. Each of these Defendants had the ability to influence the policies and management of FAT Brands by their voting and control over statements made by FAT Brands in the Offering Documents. The Individual Defendants also each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of FAT Brands.

96. FAT Brands controlled the Individual Defendants and all of its employees.

97. FCCG controlled FAT Brands prior to and following the Company's IPO. As conceded in the IPO Offering Documents, FAT Brands was at the time of its IPO

1  and would remain following the IPO a "controlled company," and that "[t]he
2  stockholders of FCCG, including Mr. Wiederhorn, will indirectly benefit from the
3  proceeds of this Offering."

4      98.    The Individual Defendants had a financial interest in taking the
5  Company's stock public in order to increase the value and marketability of their
6  investment. Defendants FCCG and Wiederhorn had particularly strong motives to
7  undertake the IPO in light of the fact that FAT Brands common stock was subject to a
8  $0.48 annual dividend, as FCCG owned eight million shares of FAT Brands common
9  stock at the time of the IPO and Wiederhorn's family owned 75% of FCCG at the time.

10      99.    This claim was brought within one year after the discovery of the untrue
11  statements and omissions in the Offering Documents and within three years after the
12  Company's securities were sold to the Class in connection with the IPO. It is therefore
13  timely.

14      100.    By reason of the above conduct, for which the Company, FCCG, the
15  Executive Defendants, and TriPoint are primarily liable, as set forth above, the
16  Individual Defendants are jointly and severally liable with and to the same extent as
17  the Company's pursuant to Section 15 of the Securities Act, 15 U.S.C. 77o.

18                                    **PRAYER FOR RELIEF**

19      WHEREFORE, Plaintiffs pray for relief and judgment as follows:

20      A.    Determining that this action is a proper class action, certifying Plaintiffs
21  as class representatives under Federal Rule of Civil Procedure 23 and appointing
22  Plaintiffs' counsel as Class Counsel;

23      B.    Awarding compensatory damages in favor of Plaintiffs and the other Class
24  members against all Defendants, jointly and severally, for all damages sustained as a
25  result of Defendants' wrongdoing, in an amount to be proven at trial, including interest
26  thereon;

27
28

1    C.    Awarding Plaintiffs and the Class their reasonable costs and expenses

2    incurred in this action, including counsel fees and expert fees;

3    D.    Awarding rescission or a rescissory measure of damages; and

4    E.    Such equitable/injunctive or other relief as deemed appropriate by the

5    Court.

6                    **JURY TRIAL DEMANDED**

7    Plaintiffs hereby demand a trial by jury.

8

9    DATED: January 15, 2019              Respectfully submitted,

10                                        **THE ROSEN LAW FIRM, P.A.**

11                                        By: /s/ Laurence M. Rosen

12                                        Laurence M. Rosen (SBN 219683)
                                          355 South Grand Avenue, Suite 2450
13                                        Los Angeles, CA 90071
                                          Tel. (213) 785-2610
14                                        Fax: (213) 226-4684
                                          Email: lrosen@rosenlegal.com
15

16

17                                        Joshua Baker (admitted *pro hac vice*)
                                          101 Greenwood Avenue, Suite 440
18                                        Jenkintown, PA 19046
                                          Tel: (215) 600-2817
19                                        Fax: (212) 202-3827
                                          Email: jbaker@rosenlegal.com
20

21

22                                        **KASKELA LAW LLC**
                                          D. Seamus Kaskela (admitted *pro hac
23                                        vice*)
                                          201 King of Prussia Road, Suite 650
24                                        Radnor, PA 19087
                                          Tel: (484) 258-1585
25                                        Email: skaskela@kaskelalaw.com

26

27                                        *Co-Lead Counsel for Lead Plaintiffs*

28

- 31 -
FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## <u>CERTIFICATE OF SERVICE</u>

1
2
3       I hereby certify that on January 15, 2019 a copy of the foregoing was filed
4   electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-
5   mail to all parties by operation of the Court's electronic filing system. Parties may
6   access this filing through the Court's CM/ECF System.
7       I certify under penalty of perjury that the foregoing is true and correct.
8
9   Executed on January 15, 2019            /s/ Laurence M. Rosen
                                            Laurence M. Rosen
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS