Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

[additional counsel on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM VIGNOLA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FAT BRANDS, INC., ANDREW A. WIEDERHORN, RON ROE, JAMES NEUHAUSER, EDWARD H. RENSI, FOG CUTTER CAPITAL GROUP INC., and TRIPOINT GLOBAL EQUITIES, LLC,<br><br>Defendants. | Case No.: 2:18-cv-07469-PSG-PLA<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Charles Jordan and David Kovacs ("Plaintiffs") individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' second amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding FAT Brands, Inc. ("FAT Brands" or the "Company"), analyst reports, news articles and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a securities class action on behalf of all persons who purchased FAT Brands common stock pursuant to FAT Brands' October 23, 2017 initial public stock offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.     This lawsuit asserts strict liability claims under sections 12(a)(2) and 15 of the Securities Act. Section 12(a)(2) provides buyers of securities an express remedy for material misstatements or omissions made by any seller or solicitor in connection with the offer or sale of the issuer's securities involving a prospectus or oral communications. Section 15 extends joint and several liability to those who controlled any person or entity held liable under § 12(a)(2). Plaintiffs expressly disclaim any allegations or inference of fraud or intentional wrongdoing as to the claims asserted herein.

3.     As alleged herein, Defendants are responsible for false and misleading statements and omitting material facts in connection with Fat Brands' IPO. Specifically, Defendants authorized or signed the Registration Statement for the IPO and an Offering Circular (collectively, the "Offering Documents") and/or participated in making false and misleading statements and omitting material facts in connection with the IPO roadshow. Accordingly, Plaintiffs bring claims against FAT Brands, certain of FAT Brands' executive officers and directors who signed the Offering Circular and/or authorized and/or participated in making the false or misleading statements and omissions contained therein and in connection with the IPO roadshow (as identified below), and Defendant TriPoint Global Equities, LLC ("TriPoint"), pursuant to §§12 and 15 of the Securities Act.

4.     FAT Brands' IPO was engineered primarily by Defendant Fog Cutter Capital Group, Inc. ("FCCG") and its CEO and controlling shareholder, Defendant Andrew W. Wiederhorn.

5.     Wiederhorn had previously pleaded guilty to two felonies and was sentenced to 18 months imprisonment and over $2 million in restitution and fines.

6.     FCCG had been publicly listed on NASDAQ, but was delisted for actions contrary to the public interest when it gave Wiederhorn a bonus matching his restitution payment as part of a financial package worth approximately $4.75 million upon his guilty plea and imprisonment, and on top of that allowed him to retain his titles and responsibilities with FCCG. FCCG was then delisted *again*, this time from the OTC Bulletin Board, when its Fatburger subsidiaries declared bankruptcy after FCCG was unable to obtain financing in connection with a string of acquisitions, substantially identical to the acquisition plan FAT Brands proposed to undertake.

7.     FCCG opted to conduct FAT Brands' IPO as a Regulation A+ offering instead of a traditional offering because a Regulation A+ offering involves a more streamlined, expedited review process. In a Regulation A+ offering, a company is

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1      required to make its offering memorandum public just 21 days prior to SEC

2      qualification, with a lower level of scrutiny than for a traditional public offering.

3          8.      Defendants made material misleading statements and omissions in the

4      Company's Offering Documents and in roadshow presentations promoting the IPO.

5      Specifically, Defendants failed to disclose and misrepresented that (1) FCCG had

6      previously been delisted from NASDAQ in light of FCCG's one-sided agreements with

7      Wiederhorn, allowing Wiederhorn to exercise substantial influence over the company

8      during his incarceration and compensating him approximately $4.75 million to do so;

9      and (2) FCCG and FAT Brands' leadership team had previously run the Fatburger

10      subsidiaries into bankruptcy in connection with the attempt to undertake an acquisition

11      spree much like the one they were undertaking at FAT Brands at the time of the

12      Company's IPO, resulting in FCCG's stock being delisted a second time.

13          9.      The IPO raised gross proceeds of $24 million, selling two million shares

14      of FAT Brands common stock at $12 per share.

15          10.      Investors were fooled by Defendants' misleading disclosures and suffered

16      damages after purchasing FAT Brands common stock pursuant to the IPO. The price

17      of FAT Brands common stock has plummeted since the IPO and currently trades at less

18      than half its IPO price of $12.

19          **<u>JURISDICTION AND VENUE</u>**

20          11.      The claims asserted herein arise under and pursuant to §§12(a)(2) and 15

21      of the Securities Act (15 U.S.C. §§77l(a)(2) and 77o).

22          12.      This Court has jurisdiction over this action pursuant to §22 of the

23      Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331.

24          13.      Venue is properly laid in this District pursuant to §22 of the Securities Act

25      and 28 U.S.C. §1391(b) as the Company's headquarters is located in this Judicial

26      District.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

14. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15. Lead Plaintiff Charles Jordan purchased FAT Brands common stock pursuant to the IPO and the Offering Circular and was damaged thereby.

16. Lead Plaintiff David Kovacs purchased FAT Brands common stock pursuant to the IPO and the Offering Circular and was damaged thereby.

17. Defendant FAT Brands is an international franchising company that acquires, markets, and develops fast casual and casual dining restaurant concepts, including Fatburger, Buffalo's Café, Buffalo's Express, Ponderosa Steakhouse, Bonanza Steakhouse, and Hurricane Grill. FAT Brands was created by FCCG, and was the wholly-owned subsidiary of Defendant FCCG at the time of the IPO. Fatburger North America, Inc. ("Fatburger"), is FAT Brands' flagship operating subsidiary. FCCG acquired Fatburger in 2003, and reorganized Fatburger along with Buffalo's Franchise Concepts Inc. ("Buffalo's Cafe") under FAT Brands in 2017. At the time of the IPO, FAT Brands was the franchisor for only Fatburger and Buffalo's Café. FAT Brands is a Delaware corporation with headquarters at 9720 Wilshire Blvd., Suite 500, Beverly Hills, CA 90212. The Company's shares trade on NASDAQ under the ticker "FAT."

18. Defendant Andrew W. Wiederhorn ("Wiederhorn") has been FAT Brands' President, Chief Executive Officer, and a member of its Board of Directors since the Company's formation, including at the time of the Company's IPO. Wiederhorn has also been the Chairman, CEO and largest individual shareholder of FCCG at all relevant times. Wiederhorn also has served as the Chairman and CEO of Fatburger North America, Inc. since 2006, and held the same positions at Buffalo's

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Franchise Concepts, Inc. since 2011. As one of FAT Brands' executives in the IPO working group, Wiederhorn reviewed and approved, and participated in making, statements to investors, including statements in the Offering Documents, which he signed, and the Company's IPO roadshow. Wiederhorn participated in the roadshow on behalf of FAT Brands and FCCG and pitched the IPO to investors, including through a live online "webinar." Wiederhorn received a $400,000 cash bonus and 15,000 shares of FAT Brands common stock for completing the IPO.[1]

19.     Defendant FCCG was an Oregon-based company that, at the time of the IPO, owned 100% of FAT Brands' common stock and voting power. Following the IPO, FCCG retained 80% of FAT Brands' common stock and voting power. Wiederhorn founded FCCG and was the chairman of its board of directors at the time of FAT Brands' IPO. FCCG's common stock was previously listed on NASDAQ, but NASDAQ delisted FCCG for actions contrary to the public interest. FCCG then traded on over the counter ("OTC") markets, but was then delisted again from the OTC Bulletin Board in connections with the bankruptcies of FCCG's operating subsidiaries.

20.     As described in FAT Brands' Prospectus, FCCG, as the controlling shareholder of FAT Brands, "exercised significant influence over corporate management and affairs of FAT Brands" and "controlled virtually all [FAT Brands] matters requiring stockholder approval." In that capacity, FCCG, through its executives, representatives, and authorized agents orchestrated the plan to effectuate the FAT Brands IPO by, among other things: (i) conducting the IPO as an expedited Regulation A+ offering; (ii) reorganizing its operating subsidiaries and contributing those subsidiaries to FAT Brands in exchange for a $30 million promissory note, (iii) negotiating and acquiring the Ponderosa & Bonanza and Hurricane Grill brands that

---

[1] The 15,000 shares Wiederhorn received became liquid and assumed a market value of $180,000 upon consummation of the IPO.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   would be integrated into FAT Brands, post-IPO; and (iv) preparing the Prospectus,
2   SEC filings, roadshow presentations, and other offering materials that were necessary
3   to take FAT Brands public.

4        21.    FCCG's key senior executives served in dual capacities as senior
5   executives at FAT Brands at all relevant times. Wiederhorn served simultaneously as
6   FCCG's Chairman and CEO and as FAT Brands' CEO, President, and Board member.
7   Defendant Roe served as CFO for both FCCG and FAT Brands. Donald Berchtold
8   served as the COO for both FCCG and Fatburger.

9        22.    FCCG, through its top executives and representatives, engaged in
10  "drafting sessions" in connection with the FAT Brands IPO between June and October
11  2017. During these sessions, FCCG's representatives reached understandings with
12  FAT Brands' representatives (to the extent they differed in identity) as to: (i) the
13  strategy to best accomplish the IPO; (ii) the terms of the IPO including the price range
14  at which FAT Brands stock would be sold; (iii) the language used in the Prospectus
15  and statements used to market and solicit investor participation the IPO, and (iv) the
16  Company's responses to the SEC in connection with the SEC's review of FAT Brands'
17  registration statement.

18       23.    FCCG, through its dominance and control over FAT Brands and
19  overlapping leadership with FAT Brands, participated in drafting and disseminating
20  the Prospectus. FCCG participated in crafting the statements made in connection with
21  efforts to solicit investors for the IPO, including in the Prospectus, Offering Summary,
22  roadshow presentations, and other offering materials. Those materials included
23  statements that were materially untrue, misleading, and/or otherwise omitted material
24  facts.

25       24.    The IPO created a liquid market through which FCCG could monetize and
26  sell its substantial stock holdings in FAT Brands. FCCG was also entitled to the lion's

27

28

share of dividends paid by FAT Brands, and was entitled to repayment of its highly favorable (to FCCG) $30 million loan at a 10% rate of interest each year.

25.     Defendant Ron Roe was the Company's Chief Financial Officer at the time of the Company's IPO, and until August 16, 2018, when he became the Senior Vice President of Finance for the Company.[2] As CFO, Roe oversaw the Company's financial reporting process. Roe also prepared, reviewed, and authorized the financial statements filed with the SEC, including critical information about the Company's financial health, business operations, growth prospects, which the Company presented to investors in the Prospectus and in the roadshow materials. Roe is also the CFO of FCCG, and served FCCG in that role at the time of the IPO.

26.     As one of FAT Brands' principal executives in the IPO working group and in his capacity as FAT Brands' CFO, Roe reviewed, approved, and participated in making statements to investors, including statements in the Prospectus, which he signed. Roe assisted in the solicitation of the sale of FAT Brands stock in the offering by, among other things, preparing, reviewing, and authorizing the presentations and other materials used in the connection with the IPO roadshow. As CFO of both FAT Brands and FCCG, Roe authorized the inclusion of statements and information in the Prospectus, roadshow presentations, and other offering materials that were materially untrue, misleading, and/or otherwise omitted material facts. Roe received a $300,000 cash bonus and 15,000 shares of FAT Brands common stock for completing the IPO.[3]

---

[2] Rebecca D. Hershinger replaced Roe as the Company's Chief Financial Officer, effective August 16, 2018.

[3] The 15,000 shares Roe received became liquid and assumed a market value of $180,000 upon consummation of the IPO.

27.     Wiederhorn and Roe are executives of FAT Brands who participated in the Company's IPO roadshow and are sometimes referred to herein as the "Executive Defendants."

28.     Defendant James Neuhauser has been a member of FAT Brands' Board since October 2017, and held that position at the time of the IPO. As one of the three members of the Board at the time of the IPO, Neuhauser reviewed, approved, and participated in making statements to investors in the Offering Documents, which he signed.[4] Neuhauser was also a member of the Audit Committee of the FAT Brands' Board. Neuhauser thus oversaw the Company's financial reporting process and reviewed the Company's reports and financial statements filed with the SEC.

29.     Defendant Edward H. Rensi is, and was at the time of the IPO, the Chairman of FAT Brands' Board. Rensi served as one of the three members (at the time of the IPO) of the Board since its formation and became Chairman of the Board in October 2017. As a member of the Board, Rensi reviewed and approved, and participated in making, statements to investors in the Offering Documents, which he signed.

30.     Wiederhorn, Roe, Neuhauser, and Rensi signed or authorized the signing of the Offering Documents used to conduct the IPO. They knew and intended that the Offering Documents would be used to promote the IPO and to solicit investors to purchase shares in the IPO. Wiederhorn, Roe, Neuhauser, and Rensi are sometimes referred to herein as "Individual Defendants."

31.     Defendant TriPoint is an investment banking firm that, along with its crowd-funding subsidiary, Banq, served as the underwriter of the IPO, acting as both

---

[4] Defendants Neuhauser and Rensi signed the Offering Documents through the signature of Defendant Wiederhorn, who signed the Offering Documents both in his own capacity as President and CEO and separately as attorney-in-fact on behalf of Defendants Neuhauser and Rensi.

Lead Manager and Book Runner. TriPoint participated in drafting and disseminating the Offering Documents used to conduct the IPO, and participated in drafting and making statements in connection with efforts to sell shares in the IPO, including the Offering Documents, roadshow presentations, and other materials appearing on TriPoint's and Banq's websites. TriPoint built the broker-dealer syndicate that handled the offering transactions. The Company paid TriPoint $1.8 million for its role in selling shares in the IPO, or 7.42% of the IPO's gross proceeds. TriPoint also obtained an agreement from FAT Brands to indemnify and hold TriPoint harmless from any liability under federal securities laws, and ensured prior to the IPO that FAT Brands had secured millions of dollars of coverage in directors' and officers' liability insurance.

## SUBSTANTIVE ALLEGATIONS

### Company Background

32.    FAT Brands is a franchisor. Rather than owning or operating actual restaurant locations, FAT Brands generates revenues primarily by charging its franchisees an initial franchise fee and ongoing royalty fees. At the time of the IPO, FAT Brands was the franchisor of two fast casual restaurant brands: Fatburger and Buffalo's Cafe/Buffalo's Express. According to the IPO Offering Documents, at the time of the IPO FAT Brands "intend[ed] to complete the acquisitions [of] Ponderosa and Bonanza [steakhouses], including one company-owned restaurant, concurrently with the consummation of" the IPO, which would add a third fast-casual restaurant brand concept to FAT Brands' portfolio. At the time of its IPO, FAT Brands' portfolio of restaurants spanned 176 locations across seven states and 18 countries.

33.    As a franchisor, FAT Brands generally did not own or operate actual restaurant locations. Instead, FAT Brands historically generated relatively strong margins (compared to other restaurant companies) by charging franchisees an initial franchise fee and ongoing royalty payments. According to the Offering Documents,

1    FAT Brands' "asset light franchisor model provide[d] the opportunity for strong profit

2    margins and an attractive free cash flow profile while minimizing restaurant operating

3    company risk, such as long-term real estate commitments or capital investments."

4         34.    Prior to the IPO, FAT Brands' flagship operating subsidiary, Fatburger,

5    accounted for the overwhelming majority of the Company's locations, revenues and

6    profits, with 157 Fatburger locations across five states and 18 countries.

7         35.    FAT Brands' other operating subsidiary, Buffalo Cafe, accounted for an

8    additional 19 locations at the time of the IPO. Buffalo's Express, which is a smaller,

9    fast-casual variant of Buffalo's Cafe, was co-branded with Fatburger so that at the time

10   of the IPO there were an additional 68 co-branded Buffalo's Express/Fatburger

11   locations.

12        36.    FAT Brands also had plans to add more restaurant brands to its portfolio

13   at the time of the IPO. According to the Offering Circular, the Company intended to

14   complete the acquisition of Homestyle Dining LLC, which owned Ponderosa

15   Franchising Company and Bonanza Restaurant Company (together, "Ponderosa &

16   Bonanza") concurrently with the consummation of the IPO. At the time of the IPO

17   there were 100 Ponderosa and 20 Bonanza restaurants operating under franchise and

18   sub-franchise agreements in 19 states, and in countries as varied as Canada, the United

19   Arab Emirates, Egypt, Qatar, Taiwan, as well as one company-owned Ponderosa

20   restaurant in the United States.

21              **The Checkered Past of Wiederhorn and FCCG**

22        37.    In 2004, Wiederhorn pleaded guilty to two felony charges in connection

23   with his former company, the predecessor to FCCG, and the collapse of Capital

24   Consultants, LLC, an investment advisor for union pension plans which lost

25   approximately $350 million in union pension funds due to fraudulent and failed

26   investments. Wiederhorn pleaded guilty to (1) giving an illegal gratuity to Capital

27   Consultants CEO Jeff Grayson; and (2) filing a false tax return. He was sentenced to

28

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  18 months in prison and was ordered to pay a $25,000 fine and $2 million in restitution

2  to the Capital Consultants receiver.

3      38.    The day before Wiederhorn entered into the plea deal, he signed an

4  agreement with FCCG, under which FCCG, while acknowledging the plea agreement

5  and imminent incarceration, nonetheless provided Wiederhorn with approximately

6  $4.75 million in benefits. Wiederhorn's agreement with FCCG stated that (1) he would

7  retain his titles and responsibilities with FCCG; (2) he would receive his annual salary

8  of $350,000, bonuses, and other benefits while imprisoned, and (3) FCCG would pay

9  Wiederhorn a $2 million "leave of absence payment," which matched precisely the

10  amount he was ordered to pay in restitution. FCCG entered the agreement ostensibly

11  to retain Wiederhorn's "good will, cooperation and continuing assistance, and in

12  recognition of Wiederhorn's past service to the Company, to help avoid litigation and

13  for . . . other reasons." FCCG knew Wiederhorn would use the $2 million payment to

14  pay his court-ordered restitution. FCCG disclosed this information and the $4.75

15  million cost of its agreement with Wiederhorn in its SEC filings. The same year that

16  FCCG entered into the deal with Wiederhorn, it reported a net loss of $3.93 million.

17      39.    FCCG had also previously entered into an agreement with Wiederhorn to

18  amend his employment contract in 2003, more than two years *after* it had known about

19  the government investigation of Wiederhorn that led to his eventual guilty plea. Under

20  the 2003 amendment, if FCCG terminated Wiederhorn without cause, it would have

21  owed him three times his annual salary, three times his largest annual bonus from the

22  last three years, unreimbursed business expenses, and accrued but unpaid base salary

23  and bonuses – or approximately $6 million in June 2004 – all as a lump-sum payment

24  within ten days. Before the 2003 amendment, termination "for cause" included any

25  felony conviction other than a traffic offense. The 2003 amendment changed the

26  relevant provision to limit the definition of a "for cause" termination of Wiederhorn to

27  only a conviction for a felony *involving FCCG*.

28

- 11 -
SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

40.     FCCG had been listed on the NASDAQ, but in July 2004, NASDAQ delisted FCCG. NASDAQ decided that it was contrary to the public interest for FCCG to remain listed in light of FCCG's patently one-sided agreements with Wiederhorn, FCCG's controlling shareholder and CEO, and because Wiederhorn was not only exercising substantial influence over the company during his incarceration, but receiving handsome compensation for it.

41.     On August 15, 2003, FCCG completed a $7 million investment and financing package for Fatburger, acquiring the remainder of the company in 2011. Wiederhorn founded and controlled FCCG as its majority shareholder. He became Fatburger's CEO in 2006 and continued to serve as FCCG's Chairman and CEO, as well as Fatburger's CEO and President, through the time of FAT Brands' IPO.

42.     In 2006, after Wiederhorn's appointment as CEO of Fatburger, Fatburger was barred from selling additional franchises in California for several months due to Wiederhorn's prior felony convictions.

43.     Then, after borrowing approximately $3.85 million from financier General Electric Capital Business Asset Funding Corp. ("GE"), on or about March 31, 2009, several Fatburger subsidiaries owned and operated by FCCG received notices of default and demand for payment from GE. The more than thirty Fatburger subsidiaries, including Fatburger Restaurants of California and Fatburger Restaurants of Nevada, were unable to repay GE and filed for Chapter 11 bankruptcy protection on April 7, 2009. Fatburger sought to restructure the GE loans as a part of the Chapter 11 bankruptcy cases, which were jointly administrated. As a result of the bankruptcy proceedings, FCCG was forced to sell off many of its Fatburger restaurants at auction.

44.     On April 8, 2009, after the bankruptcy filings, FCCG announced that it had failed to satisfy a listing requirement of the OTC Bulletin Board, where its stock had been listed after being delisted from NASDAQ. FCCG had failed to timely file its financial reports with the SEC, and announced that it expected its stock to no longer be

1  listed on the OTC Bulletin Board. The approximately eight million outstanding shares
2  of FCCG common stock became worthless.

3       45.    In 2011, FCCG acquired the 25-unit Buffalo's Cafe brand and converted
4  both the Fatburger and Buffalo's Cafe brands into a franchisor model. After acquiring
5  Buffalo's Cafe, FCCG developed the Buffalo Express concept and rolled out
6  cobranded Fatburger/Buffalo Express restaurants. FCCG reorganized Fatburger and
7  Buffalo's Café under FAT Brands Inc. in 2017 for the purpose of effectuating the IPO.

8       46.    In March 2017, FCCG agreed to acquire Homestyle Dining LLC, the
9  franchisor of the Ponderosa & Bonanza restaurants, planning to use the proceeds from
10 the anticipated FAT Brands IPO to fund the acquisition.

11                    **FCCG's Control of FAT Brands**

12      47.    At the time of the IPO, FCCG owned all eight million shares of FAT
13 Brands common stock and controlled 100% of its voting power. FAT Brands was
14 formed as a Delaware corporation on March 21, 2017, for the purposes of completing
15 the IPO, acquiring new brands, and continuing the businesses of Fatburger and
16 Buffalo's Café which were then being conducted as subsidiaries of FCCG.

17      48.    At the time of the IPO, Wiederhorn was serving as President and CEO of
18 FAT Brands as well as the Chairman and CEO of FCCG. Roe, then the Senior Vice
19 President and CFO of FAT Brands, also served as CFO of FCCG at the time of the
20 IPO.

21      49.    Berchtold, Wiederhorn's father-in-law for thirty years, served as both
22 President and Chief Operating Officer of Fatburger as well as President and COO of
23 FCCG. Wiederhorn began working for Berchtold when Wiederhorn was 13. Berchtold
24 served as Senior Vice President of Wilshire Financial Services Group ("WFSG"),
25 which Wiederhorn founded. Wiederhorn also served as the Chairman, CEO, Secretary,
26 and Treasurer for WFSG. Berchtold also served as FCCG's CEO during Wiederhorn's
27 imprisonment.

28

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

50.     FCCG, through Wiederhorn, Roe and other FCCG affiliates, planned to conduct FAT Brands' IPO as a Regulation A+, or "Reg A+," offering. Under Title IV of the 2015 Jumpstart Our Business Startups (JOBS) Act, a private company can raise public funding through a Reg A+ offering. A Reg A+ offering involves a relatively streamlined, expedited review process. In a Reg A+ offering, a company is required to make its offering memorandum public just 21 days prior to SEC qualification. In light of Wiederhorn's felonies and prison sentence and FCCG's *two* prior delistings, Wiederhorn and FCCG opted to pursue a Reg A+ offering in lieu of a traditional IPO to avoid the heightened scrutiny that a traditional IPO would entail.

51.     Wiederhorn and FCCG and its affiliates planned for FAT Brands to sell two million shares of the Company's common stock through a Reg A+ offering to investors for $12 per share, raising $24 million in gross proceeds. FCCG would retain its eight million shares and thus 80% of the voting power of FAT Brands. FCCG also "contributed" its two operating subsidiaries, Fatburger and Buffalo's Café, to the Company in connection with the IPO, in exchange for a $30 million promissory note. According to the Offering Circular, the Company planned to use $10.55 million of the IPO proceeds to purchase Ponderosa & Bonanza, and to send $9.5 million of the proceeds to FCCG to partially repay the debt. After the repayment of the $9.5 million to FCCG, FAT Brands would assume a $20.5 million debt obligation to FCCG, which would carry a 10% interest rate and mature five years following the IPO.

52.     According to the Offering Circular, FAT Brands intended to pay annual dividends of $0.48 per share. Notably, FCCG stood to receive the lion's share of those stock dividends, approximately $3.84 million annually.

**The Offering Documents and Roadshow Documents Contained Misleading Statements and Omissions of Material Fact**

53.     On or about May 5, 2017, FAT Brands filed its first draft registration statement with the SEC on Form 1-A (File No. 024-10737). Following several

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   amendments made in response to comments received from the SEC, the Form 1-A was

2   deemed qualified by the SEC on October 3, 2017 and utilized for the IPO. The

3   registration statement and Offering Circular included therein were signed by

4   Wiederhorn, Roe, Neuhauser, and Rensi.

5        54.    By August 3, 2017 at the latest, FAT Brands, the Executive Defendants,

6   FCCG (through its executive leadership in common with FAT Brands), and TriPoint

7   commenced a multi-city roadshow to market FAT Brands common stock to the

8   investing public using the Offering Documents. The roadshow was completed on or

9   about October 20, 2017, and the IPO was priced at $12 per share. Due to their extensive

10  marketing efforts, Defendants raised $24 million through the sale of two million shares

11  of FAT Brands common stock.

12       55.    As part of the IPO roadshow, on or about September 19, 2017, Defendants

13  conducted a live interactive webinar, featured on VirtualInvestorConference.com, to

14  promote FAT Brands' anticipated IPO. Defendant Wiederhorn, as CEO of both FAT

15  Brands and FCCG, FAT Brands' controlling shareholder, hosted the webinar together

16  with Mark Elenowitz, the CEO of TriPoint, and answered questions from potential

17  investors about FAT Brands and the IPO. The webinar included a video presentation

18  that contained material misstatements and omissions that defendants participated in

19  making. At the beginning of the Webinar, Elenowitz directed investors to the Banq web

20  portal, through which investors could access the Offering Documents and initiate the

21  process to purchase shares in the IPO.

22       56.    In addition to the roadshow presentations and statements, the Offering

23  Documents were negligently prepared and, as a result, also contained false and

24  misleading statements of material facts, omitted to state other facts necessary to make

25  the statements made not misleading, and were not prepared in accordance with the rules

26  and regulations governing their preparation.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

57.     At the time of the IPO, FAT Brands planned to acquire another restaurant brand immediately after the IPO. The Offering Documents expressly stated that "[i]n addition to our pending acquisition of Ponderosa and Bonanza, as of the date of this Offering Circular we have entered into a letter of intent to acquire an additional restaurant concept with approximately 60 franchised stores for approximately $11,000,000, and are in discussions to acquire another restaurant concept with approximately 50 stores for a purchase price in the range of $26-30 million. We intend to finance future acquisitions through a combination of borrowings under a proposed new credit facility and by issuing new equity securities, including preferred stock if available on terms satisfactory to us."

58.     In November 2017, FAT Brands announced the acquisition of Hurricane Grill & Wings ("Hurricane Grill"), for $12.5 million. The Company's Hurricane Grill acquisition, quick on the heels of its acquisition of Ponderosa & Bonanza, strained the Company's marginal cash position and forced the Company to take on even more high-priced debt. Due to the lack of cash on hand and difficulties securing financing on palatable terms, FAT Brands was not able to close on the Hurricane Grill acquisition until June 2018, despite initial representations that the deal would close at the end of 2017. In fact, according to the Company's annual report for 2017, filed on Form 10-K with the SEC on April 2, 2018, the Company reported having just $32,000 in cash on hand at the end of 2017, less than three months after the IPO.

59.     Under the section titled "Risk Factors," the Prospectus made the following representations concerning FCCG's ownership and control of FAT Brands:

**_We are controlled by FCCG, whose interests may differ front those of our public stockholders._**

Immediately following this Offering and the application of net proceeds from this Offering, FCCG will control approximately 80% of the combined voting power of our Common Stock, assuming the sale of the maximum number of shares in the Offering. FCCG will, for the foreseeable   future,   have   significant   influence   over   corporate

management and affairs, and will be able to control virtually all matters requiring stockholder approval. FCCG is able to, subject to applicable law, elect a majority of the members of our Board of Directors and control actions to be taken by us, including amendments to our certificate of incorporation and bylaws and approval of significant corporate transactions, including mergers and sales of substantially all of our assets.

60.     The Prospectus portrayed FAT Brands as operating under the experienced and acclaimed leadership of its officers and directors. The Prospectus emphasized that the Company's leadership members were experienced and touted their track record of success in the restaurant industry as a competitive strength. For example, the Prospectus included the following statement:

> *Seasoned and Passionate Management Team*. Our management team and employees are critical to our success. ***Our senior leadership team has more than 200 years of combined experience in the restaurant industry, and many have been a part of our team since the acquisition of the Fatburger brand in 2003. We believe that our management team has the track record and vision to leverage the FAT Brands platform to achieve significant future growth.*** In addition, through their holdings in FCCG, our senior executives will own a significant equity interest in the company following the consummation of this Offering, ensuring long-term commitment and alignment with our public shareholders. Our management team is complemented by an accomplished Board of Directors.

> [Emphasis added].

61.     The Offering Documents failed to disclose the bankruptcies filed by several of the Fatburger subsidiaries in 2009, which occurred under the direct supervision and management of FAT Brands' "seasoned" leadership team. The Offering Documents disclosed that Rensi filed for Chapter 11 bankruptcy protection in October 2015, and that WFSG, which Wiederhorn founded and served as CEO,

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  underwent a pre-packaged bankruptcy in November 1998 – more than ten years before
2  the Fatburger subsidiaries' bankruptcies.

3        62.    Yet the Prospectus did not disclose that multiple Fatburger subsidiaries
4  had filed for bankruptcy in 2009, while they were owned and operated by FCCG. At
5  the time of the bankruptcies, FCCG was managed by Wiederhorn, Berchtold, and
6  others who later served in leadership positions at FAT Brands. The Offering
7  Documents also did not disclose that FCCG, the Company's controlling shareholder,
8  had previously had its stock delisted (for the second time) in connection with those
9  bankruptcies.

10       63.    Disclosure of the Fatburger bankruptcies, and of the resulting (second)
11  delisting of FCCG, would have significantly altered the mix of information available
12  to investors concerning the ability and experience of the leadership of FAT Brands at
13  the time of the IPO. Defendants' omission of these material facts rendered the
14  statements about the experience and effectiveness of FAT Brands' leadership
15  materially false and misleading.

16       64.    In November 2009, the Fatburger subsidiaries that entered Chapter 11
17  bankruptcy filed a "Summary of the Circumstances that Led to the Filing of the
18  Debtors' Chapter 11 Cases." In the Summary, the Fatburger subsidiaries stated that the
19  subsidiaries of Fatburger, which was run by Wiederhorn and Berchtold and 83% owned
20  by FCCG at the time, had "beg[u]n to experience financial problems as a result of: (1)
21  a shortage in available restaurant financing, and (2) a decline in same store sales over
22  the past three years." The Fatburger subsidiaries had been forced to borrow from GE
23  in order to finance an acquisition spree, but when GE refused to continue lending to
24  them, "[t]he Debtors and their affiliates were not able to find alternate financing and
25  were forced to finance the expenses … from their existing cash flow." "This strain on
26  existing cash flow caused the Debtors to fall behind on their accounts payable and real
27  property lease obligations," forcing them into bankruptcy.

28

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

65.     At the time of the IPO, the exact same management team (FCCG, Wiederhorn, and Berchtold) that oversaw Fatburger in 2009 was in the midst of yet another acquisition spree. It would have been particularly material to investors to know of the management team's prior inability to obtain financing in connection with an acquisition spree, which had resulted in Fatburger subsidiaries filing for bankruptcy, and ultimately in FCCG being delisted for a second time. The financial problems leading to the default and bankruptcies occurred as a result of problems obtaining financing and declining sales.

66.     Although the Fatburger bankruptcies were publicly disclosed through bankruptcy filings at the time they occurred, they were not well-known to investors. Thus, disclosure of the bankruptcies in the Offering Documents would have significantly altered the total mix of information available to investors about the bankruptcies.

67.     The Offering Documents quietly disclosed Wiederhorn's guilty plea and incarceration, artfully avoiding any use of the word "felonies." However, they misleadingly omitted the fact that FCCG was delisted from NASDAQ due to FCCG's patently one-sided agreements with Wiederhorn, signed in light of the investigation which led to Wiederhorn's guilty plea on the two felony counts, and the fact that Wiederhorn was exercising substantial influence over FCCG during his incarceration and receiving approximately $4.75 million in compensation for his troubles.

68.     Similarly, disclosure of the circumstances surrounding Wiederhorn's misconduct and FCCG's resulting delisting from NASDAQ would have significantly altered the total mix of information presented to investors concerning the leadership and management of FAT Brands in the Offering Documents.

### TriPoint's Liability

69.     TriPoint arranged the roadshow leading up to the IPO. During the roadshow, TriPoint and the Executive Defendants made presentations to potential

investors about the Company, its operations, and its financial prospects. TriPoint also organized a live interactive webinar during which Wiederhorn and the CEO of TriPoint presented information about FAT Brands and the offering to investors. TriPoint and Banq also created websites soliciting investments in the FAT Brands IPO that were accessible from TriPoint's and Banq's own home pages. TriPoint also participated in scripting and creating videos about FAT Brands and its IPO, and made them accessible from the Banq website, which also allowed investors to view the Offering Documents, open an account with Banq, and purchase shares of FAT Brands. Banq's online web portal, created and designed at the direction of TriPoint, provided investors direct access to information about the IPO, including the Prospectus, and the ability to initiate a purchase in the IPO. The IPO was sold through TriPoint's and Banq's websites, and TriPoint authorized, approved, participated in making, and communicated the statements in the roadshow videos to investors who purchased FAT Brands shares in the IPO through TriPoint's and Banq's websites.

70. TriPoint assisted the Company, FCCG, and the Individual Defendants in planning the IPO. During that process, TriPoint purportedly conducted a due diligence investigation into FAT Brands' business and operations. TriPoint was required to undertake the due diligence investigation in order to engage in the IPO. During the course of its investigation TriPoint had continual access to confidential corporate information concerning the Company's operations and financials and maintained constant contact and communications with the Company. TriPoint also met with the Company's employees and executives during drafting sessions starting no later than June 2017. During the drafting sessions TriPoint discussed with the Company, among other things, the strategy to consummate the IPO, the statements and disclosures included in the Offering Documents and in marketing efforts to promote the IPO, and the Company's responses to the SEC's comments concerning the SEC's review of the draft Offering Documents. TriPoint caused the Offering Documents to be filed with the

1   SEC and declared qualified in connection with offers and sales thereof, including to

2   Plaintiffs and the Class (as defined below).

3       71.    The IPO was successful for FAT Brands and TriPoint, who sold two

4   million shares of FAT Brands common stock to public investors at $12 per share,

5   raising $24 million in gross proceeds ($22.2 million net of underwriting fees and IPO

6   costs).

7       72.    The price of FAT Brands common stock has plummeted since the IPO and

8   currently trades at approximately $5.84 per share, down over 50% from the Company's

9   $12 IPO price just over one year earlier.

10                          **CLASS ACTION ALLEGATIONS**

11      73.    Plaintiffs bring this action as a class action pursuant to Federal Rule of

12   Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than

13   defendants who purchased FAT Brands common stock pursuant to the Offering

14   Documents issued in connection with the Company's IPO and who were damaged

15   thereby (the "Class"). Excluded from the Class are Defendants, the officers and

16   directors of the Company, members of the Individual Defendants' immediate families

17   and their legal representatives, heirs, successors or assigns and any entity in which the

18   officers and directors of the Company have or had a controlling interest.

19      74.    The members of the Class are so numerous that joinder of all members is

20   impracticable. Since the IPO, the Company's securities were actively traded on

21   NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this

22   time and can be ascertained only through appropriate discovery, Plaintiffs believe that

23   there are hundreds, if not thousands of members in the proposed Class. Record owners

24   and other members of the Class may be identified from records maintained by FAT

25   Brands or its transfer agent and may be notified of the pendency of this action by mail,

26   using the form of notice similar to that customarily used in securities class actions.

27

28

75.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

76.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether Defendants issued materially false and misleading statements;

b.     whether the Offering Documents were negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein;

c.     whether other statements issued by Defendants were materially misleading and/or omitted material information;

d.     the extent to which members of the Class have sustained damages and the proper measure of damages

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**COUNT I**
**Violations of §12(a)(2) of the Securities Act**
**Against Defendants FAT Brands, FCCG, the Executive Defendants,**
**and TriPoint**

79.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

80.     By means of the defective Offering Documents and other statements made in connection with the roadshow, Defendant FAT Brands, Defendant FCCG, the Executive Defendants and TriPoint promoted and sold FAT Brands' common stock to Plaintiffs and other members of the Class.

81.     The Offering Documents and roadshow contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above. These Defendants owed Plaintiffs and the other members of the Class who purchased FAT Brands common stock pursuant to the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents as set forth above.

82.     Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the Offering Documents and roadshow presentation at the time Plaintiffs acquired FAT Brands common stock.

83.     By reason of the conduct alleged herein, each of the Defendants named in this Count violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased FAT Brands common stock pursuant to the Offering Documents sustained substantial

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

damages in connection with their purchases of FAT Brands stock. Accordingly, Plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

84.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after FAT Brands shares were sold to the Class in connection with the IPO.

## COUNT II
### Violation of §15 of the Securities Act
### Against Defendants FAT Brands, FCCG, and the Individual Defendants

85.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

86.    This Count is brought pursuant to §15 of the Securities Act against Defendant FAT Brands, Defendant FCCG, and the Individual Defendants.

87.    The Individual Defendants each were control persons of FAT Brands by virtue of their positions as directors and/or senior officers of FAT Brands. Each of these Defendants had the ability to influence the policies and management of FAT Brands by their voting and control over statements made by FAT Brands in the Offering Documents. The Individual Defendants also each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of FAT Brands.

88.    FAT Brands controlled the Individual Defendants and all of its employees.

89.    FCCG controlled FAT Brands prior to and following the Company's IPO. As conceded in the IPO Offering Documents, FAT Brands was at the time of its IPO and would remain following the IPO a "controlled company," and that "[t]he

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  stockholders of FCCG, including Mr. Wiederhorn, will indirectly benefit from the
2  proceeds of this Offering."

3      90.    The Individual Defendants had a financial interest in taking the
4  Company's stock public in order to increase the value and marketability of their
5  investment. Defendants FCCG and Wiederhorn had particularly strong motives to
6  undertake the IPO in light of the fact that FAT Brands common stock was subject to a
7  $0.48 annual dividend, as FCCG owned eight million shares of FAT Brands common
8  stock at the time of the IPO and Wiederhorn's family owned 75% of FCCG at the time.

9      91.    This claim was brought within one year after the discovery of the untrue
10  statements and omissions in the Offering Documents and within three years after the
11  Company's securities were sold to the Class in connection with the IPO. It is therefore
12  timely.

13      92.    By reason of the above conduct, for which the Company, FCCG, the
14  Executive Defendants, and TriPoint are primarily liable, as set forth above, the
15  Individual Defendants are jointly and severally liable with and to the same extent as
16  the Company's pursuant to Section 15 of the Securities Act, 15 U.S.C. 77o.

## **PRAYER FOR RELIEF**

18      WHEREFORE, Plaintiffs pray for relief and judgment as follows:

19      A.    Determining that this action is a proper class action, certifying Plaintiffs
20  as class representatives under Federal Rule of Civil Procedure 23 and appointing
21  Plaintiffs' counsel as Class Counsel;

22      B.    Awarding compensatory damages in favor of Plaintiffs and the other Class
23  members against all Defendants, jointly and severally, for all damages sustained as a
24  result of Defendants' wrongdoing, in an amount to be proven at trial, including interest
25  thereon;

26      C.    Awarding Plaintiffs and the Class their reasonable costs and expenses
27  incurred in this action, including counsel fees and expert fees;

28

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    D.    Awarding rescission or a rescissory measure of damages; and

2    E.    Such equitable/injunctive or other relief as deemed appropriate by the

3 Court.

4                              **JURY TRIAL DEMANDED**

5    Plaintiffs hereby demand a trial by jury.

6

7 DATED: August 5, 2019                    Respectfully submitted,

8                                          **THE ROSEN LAW FIRM, P.A.**

9
                                           By: /s/ Laurence M. Rosen
10                                         Laurence M. Rosen (SBN 219683)
                                           355 South Grand Avenue, Suite 2450
11                                         Los Angeles, CA 90071
                                           Tel. (213) 785-2610
12                                         Fax: (213) 226-4684
                                           Email: lrosen@rosenlegal.com
13

14                                         Joshua Baker (admitted *pro hac vice*)
15                                         101 Greenwood Avenue, Suite 440
                                           Jenkintown, PA 19046
16                                         Tel: (215) 600-2817
                                           Fax: (212) 202-3827
17                                         Email: jbaker@rosenlegal.com
18

19                                         **KASKELA LAW LLC**
20                                         D. Seamus Kaskela (admitted *pro hac
                                           vice*)
21                                         201 King of Prussia Road, Suite 650
                                           Radnor, PA 19087
22                                         Tel: (484) 258-1585
                                           Email: skaskela@kaskelalaw.com
23

24                                         *Co-Lead Counsel for Lead Plaintiffs*
25

26

27

28
                                     - 26 -
                    SECOND AMENDED CLASS ACTION COMPLAINT
                  FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ROBBINS ARROYO LLP**
Stephen J. Oddo
Gregory Del Gaizo
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
Email: gdelgaizo@robbinsarroyo.com
　　　　soddo@robbinsarroyo.com

*Additional Counsel for Plaintiffs*

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 5, 2019 a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on August 5, 2019          /s/ Laurence M. Rosen
                                    Laurence M. Rosen

SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS